Pg. 25

**F I L E D**
Chris Daniel
District Clerk

CAUSE NO. **2 0 1 2    4 7 7 5 5**

AUG 2 1 2012

Time: _____
Harris County, Texas
By _____

| | | |
|---|---|---|
| **VANTAGE DRILLING COMPANY**<br>**Plaintiff** | §<br>§<br>§ | **IN THE ____ DISTRICT COURT** |
| **VS.** | §<br>§ | **295th OF HARRIS COUNTY** |
| **HSIN-CHI-SU A/K/A NOBU SU**<br>**Defendant** | §<br>§<br>§<br>§ | **JURY TRIAL DEMANDED** |

## PLAINTIFF'S ORIGINAL PETITION

NOW COMES Plaintiff, VANTAGE DRILLING COMPANY and files this Original Petition complaining of and about HSIN-CHI-SU a/k/a NOBU SU and in support thereof would show the Court as follows:

### I.
### DISCOVERY LEVEL

1.      Discovery should be conducted under Discovery Level 3 as set forth by the Texas Rules of Civil Procedure 190.4. The issues in this case will be complex and discovery will necessarily involve many witnesses who reside outside the United States. Therefore, Plaintiff Vantage anticipates an agreed upon plan tailored to the requirements of this case to be submitted to the Court for approval at the appropriate time.

### II.
### PARTIES AND SERVICE

2.      Plaintiff, VANTAGE DRILLING COMPANY ("Vantage") is a corporation, incorporated under the law of the Cayman Islands with its principal office in Houston, Harris County, Texas.

3.      Defendant, HSIN-CHI-SU a/k/a NOBU SU ("Su"), is an individual and resident of Taipei, Taiwan. Pursuant to rules 108(a)1 and 106 of the Texas Rules of Civil Procedure

1

**Exhibit 1**

CONFIRMED FILE DATE: 8/21/2012

Certified Document Number: 53120996 - Page 1 of 25

Defendant Su may be served Plaintiff's Original Petition and citation at 10 Fl No. 245, Dunhua South Rd., Sec. 1, Da-an District, Taipei City, Taiwan, R.O.C., or wherever he may be found.

## III.
## JURISDICTION AND VENUE

4.      The subject matter in controversy is within the jurisdictional limits of the Court. Venue in Harris County is proper in this cause under Section 15.002(a)(1) of the Texas Civil Practice and Remedies Code because all or a substantial part of the events or omissions giving rise to this lawsuit occurred in this county.

5.      The events upon which this lawsuit is based occurred in Houston, Texas. Vantage is an offshore drilling company founded in 2006 which contracts a fleet of jackup rigs and deepwater drillships to operators around the world. From June 12, 2008 through April 14, 2011, Defendant Su was a director of Vantage. Many of Vantage's board meetings occurred in Houston Texas, which Su regularly attended both in person and by phone. Su also conducted various meetings with Vantage management and other Vantage directors in Houston. Su systematically and continuously conducted Vantage-related business as well as other business in Houston, Texas. Su's actions made the basis of this lawsuit occurred in Houston Texas.

## IV.
## BACKGROUND

### Introduction:

6.      Throughout his nearly three years as a Vantage director, Su systematically and willfully breached his fiduciary duties to Vantage. Through a series of misrepresentations, material omissions and outright lies to Vantage, Su used his fiduciary position for the sole purpose of self-enrichment. He purposefully and repeatedly placed Vantage in severe financial distress—which at times threatened the *very existence* of the company—only to then take

2

advantage of that distress to enrich himself further. Through his repeated dishonest and bad faith conduct, Su has obtained approximately 100 million shares of Vantage stock (amounting to approximately 34 percent of the company's total shares), corporate control (including the ability to nominate four directors), and tens of millions of dollars in loans and outright cash from Vantage. This lawsuit seeks to recover these ill-gotten gains and to remedy the significant harm that Su has inflicted on Vantage.

### About Vantage Drilling Company:

7.      In September 2006, Paul Bragg—Vantage's current CEO and former CEO of Pride International—and several other principals experienced in the offshore drilling industry founded Vantage as a "Special Purpose Acquisition Company," or "SPAC."[1]  In May 2007, Vantage raised $276 million through an Initial Public Offering. As a SPAC, Vantage had equity capital and an experienced management team, but no assets. Its mission, however, was clear: to search for and acquire offshore drilling assets, which it could then contract out to operators around the world. If Vantage could not identify an attractive opportunity to acquire such offshore drilling assets within approximately two years the company would dissolve, and its equity would be returned to investors.

8.      From Vantage's earliest days, the company's business plan had been to differentiate itself by building a modern fleet with ultra-deepwater drilling capabilities at water depths greater than 10,000 feet, and in some cases up to 12,000 feet, and the highest levels of technical expertise. Building these deepwater capabilities would require substantial investments in ultra-deepwater drillships, which can operate in seas greater than 10,000 feet through the use

---

[1] Vantage was originally founded as Vantage Energy Services, Inc. ("Vantage Energy"), a Delaware corporation, which became a wholly-owned subsidiary of Vantage through various transactions consummated on June 12, 2008. *See* ¶¶ 15 and 16, below.

3

Certified Document Number: 53120996 - Page 3 of 25

of dynamic positioning technology.[2]  Ultra-deepwater drillships are generally in excess of 750 feet long, 130 feet wide, and typically cost more than $600 million.  It is estimated that there are only 61 ultra-deepwater drillships in existence today, and that only 15 existed in mid 2007, when Vantage began its quest to acquire or construct modern offshore drilling assets.  In short, ultra-deepwater drillships are among the most advanced and expensive assets in the offshore drilling industry.  Thus, any offshore drilling contractor that possesses such a ship among its fleet stands in a relatively small class of companies.

9.      In contrast to an ultra-deepwater drillship, a "jackup rig" is a more conventional mobile drilling platform, capable of drilling in shallow waters up to 500 feet deep.  These rigs are called "jackup" rigs because they actually have adjustable legs that can be lowered to the seafloor to then raise the drilling platform above sea level.  It is estimated that there are 472 jackup rigs in existence today, and that 373 existed in mid 2007.  Although Vantage has sought to maintain a balanced mix of offshore drilling assets through the acquisition of jackup rigs, the company has focused on the acquisition of ultra-deepwater drillships.

**Nobu Su and Vantage**:

10.      Soon after the company's formation, Vantage management was introduced to Nobu Su, a Taiwanese businessman with a background in the shipping industry and extensive business contacts with shipyards in Korea and Singapore.  Specifically, upon his introduction to Vantage in 2007, Su represented that he owned construction contracts for four jackup rigs and two ultra-deepwater drillships being built at PPL Shipyard Pte Ltd. in Singapore ("PPL") and the Daewoo Shipbuilding & Marine Engineering shipyard in Korea ("DSME"), respectively.  These

---

[2] Dynamic positioning is a computer controlled system that automatically maintains a ship's position and heading by using its own propellers and thrusters.

Certified Document Number: 53120996 - Page 4 of 25

four jackup rigs and two drillships were precisely the kind of assets that Vantage had hoped to acquire, so Vantage entered into negotiations with Su.

11.     On August 30, 2007, Vantage issued a press release announcing that it had reached a deal with Su.  In its press release, Vantage disclosed that it would acquire the construction contracts on the four jackup rigs and critically, an option to purchase the *Platinum Explorer*, one of the two ultra-deepwater drillships under construction at DSME in Korea. Specifically, Vantage announced that F3 Capital, an entity 100% owned and controlled by Su—would sell all of its stock in Offshore Group Investments Limited ("OGIL") to Vantage.  OGIL, in turn, was a wholly-owned subsidiary of F3 Capital whose sole assets were the construction contracts on the four jackup rigs.[3]

12.     In exchange for the jackup rig contracts and the option on the *Platinum Explorer*, Su—through F3 Capital—would receive approximately $56 million in cash, $275 million worth of Vantage stock and warrants, and the right to nominate three members of Vantage's nine-member board of directors, among other consideration.  The deal was subject to customary closing conditions, including certain closing adjustments, and shareholder approval.  If consummated, the deal would make Su the largest single shareholder of Vantage, with control of three board seats, and considerable confidential knowledge of—and influence over—Vantage's affairs.

13.     On March 24, 2008, Vantage exercised its option to acquire the *Platinum Explorer* for approximately $676 million, and it also acquired an option on the *Titanium Explorer*, the second ultra-deepwater drillship under construction at DSME in Korea.  Under this transaction, OGIL acquired the underlying assets from Mandarin Drilling Company

---

[3] OGIL would later acquire a contract for the purchase of the *Platinum Explorer* and an option for the purchase of the *Titanium Explorer*, *see* ¶ 13, below.

Certified Document Number: 53120996 - Page 5 of 25

("Mandarin")—another entity 100% owned and controlled by Su. Specifically, OGIL acquired from Mandarin (i) a contract for the purchase of the *Platinum Explorer* for $676 million and (ii) an option for the purchase of the *Titanium Explorer*, the second drillship under construction at DSME. Under the terms of the *Platinum Explorer* contract, OGIL would pay 30% of the $676 million purchase price to Mandarin on September 13, 2008, and the remaining 70% on November 10, 2010, upon completion and delivery of the drillship.

14.    In connection with this transaction, Su represented to Vantage that Mandarin, in turn, had executed a construction contract with DSME, the Korean shipyard, for the construction of the *Platinum Explorer*. Vantage was provided with a copy of the shipyard contract but with the payments terms redacted. Su stated that he was unable to disclose the terms publicly because he had a "special relationship" with the shipyard and the terms he was able to obtain from DSME needed to be kept confidential from the market in general. Nevertheless, Su represented to Vantage, on repeated occasions, that the Mandarin-DSME construction contract required a 30% down payment to DSME, with 70% due upon the completion of the drillship. Indeed, the March 24, 2008 contract between Vantage and Mandarin provided for the exact same payment terms of 30% down and 70% due upon completion. Finally, Su represented to Vantage, on repeated occasions, that Mandarin had <u>already made</u> the necessary down payment to DSME.

15.    In a March 31, 2008 press release announcing this transaction, Paul Bragg, Vantage's CEO, noted that the *Platinum Explorer* would be the "flagship" of the Vantage fleet, and would enhance the company's "focus" on deepwater assets. On June 10, 2008, Vantage's stockholders approved the deal with Su and on June 12, 2008, the deal closed.

16.    Upon closing, Vantage's stock began to trade on the American Stock Exchange, and Su—through F3 Capital—received the consideration described previously, including $275

Certified Document Number: 53120996 - Page 6 of 25

million in Vantage stock and warrants, $56 million in cash, and the right to nominate three members of Vantage's board of directors.  In return, Vantage, through its new ownership of OGIL, had acquired construction contracts on the four jackup rigs, a contract for the purchase of the *Platinum Explorer* for $676 million (with 30% due to Mandarin in September 2008 and the remaining 70% due in November 2010), and an option on the *Titanium Explorer*.

17.    In connection with closing, Vantage also secured a $440 million credit agreement with a syndicate of lenders to finance the construction and delivery of the four jackup rigs (the "Jackup Rig Financing").  The Jackup Rig Financing consisted of a Term Loan in the amount of $320 million (for construction costs on the jackup rigs), a Top-up Loan in the amount of $80 million (for general corporate purposes, but available only if the jackup rigs were employed under a drilling contract which had sufficient forecasted cash flow to repay the Top-up Loan in full), and a Revolving Loan in the amount of $40 million (for letters of credit and performance bonds to support drilling contracts for the jackup rigs).  At the time of the June 12, 2008 closing, however, Vantage had not yet secured financing for the $676 million purchase of the *Platinum Explorer*.

18.    Vantage was pleased with the deal it reached with Su, and excited about its future.  The company was well along the path toward becoming one of the world's select few deepwater drilling contractors.  The stock market reacted positively to the deal, as well.  On June 11, 2008, the day before closing, Vantage's stock price closed at $8.00 per share.  One week later, on June 18, 2008, although the S&P 500 Index was nearly unchanged, Vantage's stock price had risen to $9.19, for a gain of approximately 15 percent.

Certified Document Number: 53120996 - Page 7 of 25

**Su's Emerging Pattern of Deception**:

19.     Vantage's cause for celebration, however, was short-lived.  Vantage would soon learn that Su had <u>misrepresented</u> the terms of the underlying *Platinum Explorer* construction contract between Mandarin and DSME.  Vantage would also soon discover that, in an egregious violation of Su's fiduciary duties to Vantage, Su would continue to perpetrate this fraud from June 12, 2008—when Su joined Vantage's board of directors—through August 29, 2008, when Vantage finally learned the truth about Mandarin's contract with DSME.  As described in detail below, Vantage's reliance on Su's misrepresentations caused severe financial distress to Vantage, and the company nearly lost both the *Platinum Explorer* and the four jackup rigs.

20.     Su's misrepresentations regarding the *Platinum Explorer* construction contract were actually just the first in a series of Su's bad faith misrepresentations and material omissions in his dealings with Vantage.  In complete disregard of his fiduciary duties of loyalty, good faith, candor, and honesty, Su continually devised new schemes to personally enrich himself at the expense of Vantage and its shareholders.  Although Su's breaches of his fiduciary duties came in different forms, there were generally three common steps to Su's behavior:

1) Su would materially misrepresent a fact or series of facts, in order to induce Vantage to enter into a particular contractual arrangement with him or companies he controlled;

2) Su would wait for his misrepresentations to cause severe financial distress to Vantage, placing the company under duress with no option but to re-negotiate its arrangements with Su (because of his continued leverage maintained by his separate control of the construction contracts); and

3) Su would then enrich himself through the re-negotiation with Vantage, to the substantial detriment of Vantage and its shareholders.

Certified Document Number: 53120996 - Page 8 of 25

### Su Misrepresents Terms of the Contract with DSME for the *Platinum Explorer*:

21.     As discussed above, throughout Vantage's negotiations with Su in 2007 and 2008, Su repeatedly represented to Vantage that Mandarin's *Platinum Explorer* construction contract with DSME required a 30% down payment to DSME, with the remaining 70% due to DSME upon completion.  Su further represented to Vantage that he had already caused Mandarin to make the 30% down payment to DSME.  Based upon these representations, Vantage entered into the transactions consummated on June 12, 2008, and planned to arrange a debt financing to fund a down payment for Vantage's acquisition of the *Platinum Explorer* from Mandarin according to these purported terms (hereinafter referred to as the "*Platinum Explorer* down payment financing").

22.     By Summer 2008, Vantage's management team began to plan a bond offering "road show," with DnB Nor, one of its investment bankers, to arrange for the *Platinum Explorer* down payment financing to reimburse Su for the 30% down payment.  Vantage also issued numerous public disclosures concerning the transaction with Su and the contemplated debt financing.  DnB Nor, as part of its normal practice in creating a financing package, requested an unredacted copy of the shipyard contract.  When Vantage in turn asked Su for an unredacted copy of the contract it was met with resistance.  Specifically, Vantage was told by Su's people that the payment terms of the shipyard contract were confidential and that the contract would not be forthcoming.  While Vantage trusted Su's representations his refusal to produce the unredacted contract began to pose an increasing problem with DnB Nor.

23.     In late August 2008, as the road show drew near, and in response to pressure from DnB Nor, Vantage renewed its demands for Su to provide an unredacted copy of the Mandarin-DSME construction contract for the *Platinum Explorer*.  Su stalled, but continued to assure

Certified Document Number: 53120996 - Page 9 of 25

Vantage that the terms were 30/70. Finally, the pressure from DnB Nor reached a level such that Su relented and produced the unredacted contract on or about August 29, 2008, on the eve of Vantage's road show.

24.     That unredacted contract revealed that there were, in fact, no 30/70 payment terms in the construction contract between Mandarin and DSME, as Su had claimed. Instead, Mandarin's contract with DSME required four separate 5% installments to DSME pre-delivery, with 80% due upon completion. It was further revealed that Su had caused Mandarin to make only <u>one</u> of these 5% installments, not a 30% down payment, as represented. This last-minute revelation ruined any hope to timely finance the acquisition payment due to Su for the *Platinum Explorer* down payment financing as originally planned, and Vantage was forced to seek alternatives. The bond offering was dead, and Vantage's reputation with its investment bankers had suffered substantial injury.

25.     Because of Su's lies, the bond offering was not concluded to fund the acquisition and as a result, Vantage's stock price fell approximately 55% in September 2008, compared to a 22% drop for companies in its industry segment. Vantage was forced to scrap its financing plan and re-group. If it could not arrange new down payment financing for the *Platinum Explorer*, based on the actual 5-5-5-5-80 terms of the DSME construction contract, Vantage risked losing its opportunity to build the deepwater capabilities which were central to its announced business objective. Though a Vantage director and controlling shareholder, Su exhibited no concern about the company's dilemma. To the contrary, Su happily retained his Vantage stock, board seats, and other consideration, which had been conveyed to him by Vantage on June 12, 2008, in reliance on his misrepresentations.

Certified Document Number: 53120996 - Page 10 of 25

**Su extracts $32 million payment from Vantage:**

26.     After the cancelled road show, Vantage was forced to act quickly to come up with new financing for the installment payment then due for the *Platinum Explorer*. The need for such financing became even more urgent when, on or about September 8, 2008, just nine days after revealing the actual contract terms with DSME, Su informed Vantage that he did not have the funds individually to make the next 5% payment ($32 million) due to DSME. Su further represented to Vantage that he needed $32 million from Vantage to pay DSME "immediately," or else he would be in breach of the DSME construction contract (which he personally controlled at all times), and the *Platinum Explorer* could be lost.

27.     To Vantage, losing the *Platinum Explorer* at that point would have been disastrous and would have caused the failure of the company to execute on its central business plan. Thus, Vantage proposed to Su that Vantage make the payment to DSME directly, so the *Platinum Explorer* would not be lost. Su, however, refused Vantage's offer, and insisted that his business relationship with DSME required that the payment be made by Su directly. Vantage was forced to relent to Su's demand, and agreed to fund the $32 million payment to Su so that he could pay DSME.

28.     As a consequence of Vantage's financing for the *Platinum Explorer* being scuttled by Su, Vantage was forced to reallocate funds it could ill-afford to provide to Su in order for him to make the $32 million payment. As a consequence, the syndicate of banks providing the $440 million Jackup Rig Financing complained that this $32 million payment to Su effectively diverted funds that had been earmarked for construction costs on the jackup rigs. For this reason, the syndicate demanded that Vantage retrieve the $32 million from Su.

Certified Document Number: 53120996 - Page 11 of 25

29.     The syndicate's continued willingness to finance the jackup rigs was now in jeopardy.  If the syndicate pulled funding for the jackup rigs, Vantage risked a default on the underlying construction contracts with PPL, the shipyard in Singapore.  If Vantage defaulted, it was faced with a substantial breach of contract suit from PPL.  The net effect, therefore, of Su's demand for a $32 million payment on the *Platinum Explorer*—which came just nine days after Su revealed his *Platinum Explorer* lie—was again to put Vantage under severe duress and at risk of losing all of the very assets that it had just acquired from Su at enormous expense.

30.     Vantage would then discover, however, that the $32 million payment was not due "immediately" to DSME.  Instead, as Su well knew when he obtained the $32 million payment from Vantage, Su had been granted a deferral from DSME for the payment.  The payment was not, in fact, due "immediately," but rather was now due on October 31, 2008.  So, between September 25, 2008 (on or about the date when Su received the $32 million from Vantage) and October 31, 2008 (when the payment was actually due), Director Su was content to sit by as Vantage was forced to the brink of a liquidity crisis and subjected to risk of losing the four jackup rigs.

31.     Vantage did not discover this lie until November 18, 2008, when Su casually revealed that he had made the $32 million payment to DSME on October 31, 2008.  Through this further misrepresentation, it now appears that Su effectively obtained an interest-free loan from Vantage for $32 million, which he presumably used to meet his other business or personal obligations (not related to Vantage or the offshore drilling assets).

32.     Upon discovering Su's lie, Vantage demanded that Su reimburse the $32 million to Vantage.  Su refused, an action which once again drove Vantage toward a further liquidity crisis; it was running out of cash, and its risk of defaulting on the jackup rig construction

Certified Document Number: 53120996 - Page 12 of 25

installments was increasing by the day. Vantage pressed Su for several months, and Su eventually agreed to "return" the $32 million, but only in the form of a loan back to Vantage, and furthermore, on the condition that the loan be convertible into Vantage stock.

33.     To Su, however, a deal was never a deal. Instead of loaning the full $32 million back to Vantage, Su insisted that Vantage accept a $20 million credit line which was convertible into Vantage stock. Su then refused, however, to fund the credit line and demanded an even lower conversion price. Vantage refused to lower the conversion price. Su agreed to provide another note for $10 million provided that it had a lower conversion price and provided further that it be drawn first. Su then demanded that the $20 million credit line be reduced to $4 million. Vantage was thus once again compelled by Su's conduct and demands to renegotiate its arrangements with Su on different and more favorable terms for Su, or risk losing its jackup and drillship contracts.

34.     Through these machinations and the subsequent conversion of both notes, Su was able to extract over 14 million additional shares of Vantage stock at a fraction of the underlying book value of the outstanding shares.[4] In this way, Su again took advantage of the very financial distress that his misrepresentations had created, this time through his misrepresentation that the 5% installment was due to DSME "immediately" when he knew full well it was not.

### Su Extracts Additional Vantage Shares in January 2009:

35.     In January 2009, around the time that Su was re-negotiating the terms of his "loan" to Vantage, Vantage's option on the second drillship, the *Titanium Explorer*, was set to expire. As discussed above, Vantage had acquired this option in March 2008, a full six months before Vantage discovered Su's lies regarding the *Platinum Explorer* contract. If the *Titanium*

---

[4] Su received approximately 10.3 million shares through conversion of the December note, and approximately 3.9 million shares through conversion of the March note.

13

*Explorer* option expired unexercised in January 2009, Su was entitled to even more Vantage stock, based on a pre-determined conversion formula. By early 2009, however, Su's misconduct as a director and major shareholder had continued to subject Vantage to significant financial duress, and the company was not in a position to exercise the option. Instead, Vantage was forced to let the option expire, and to incur a termination penalty, triggering issuance of another 7.3 million Vantage shares to Su. Once again, Su's misrepresentations served to enrich Su and cause serious injury to Vantage and its stockholders.

36.     Additionally, on January 9, 2009, Vantage issued approximately 5.5 million shares in a private placement to Su, through F3 Capital, in consideration for $8 million. The proceeds of this issuance were used to fund Vantage's portion of the collateral for a performance bond and for general corporate purposes. Vantage was forced to issue this equity to Su—which significantly diluted Vantage's other stockholders—precisely because Su's misconduct during 2008 had left Vantage without an alternative and more favorable source of financing to meet its obligations as they came due. Furthermore, in connection with this private placement, Su also insisted on the ability to nominate an additional director to Vantage's board of directors, thereby increasing the total number of board seats under Su's control from three to four.

### The "Joint" Venture Funding of *Platinum Explorer*:

37.     As described previously, soon after the August 29, 2008 revelation of Su's lies about the terms of the *Platinum Explorer* contract, Vantage was forced to explore alternative financing for the installment payment then due for the *Platinum Explorer* drillship. Deepwater drilling assets were, after all, the *sine qua non* of Vantage's business plan, and as of August 29, 2008, Vantage was put at risk of losing its committed and only hope to acquire such assets. Vantage also by this time had recruited a team with ultra deepwater expertise. Loss of these

14

assets would lead to loss of the team. Su's leverage throughout this period in which he served as a fiduciary to Vantage was clear and persuasive: through Mandarin, he owned the *Platinum Explorer* construction contract with DSME, so if Vantage hoped to acquire *Platinum Explorer*, as it did, Vantage would be forced to re-negotiate with Su directly or risk at each juncture, Su's further default on the end contracts with the shipyards and loss of Vantage's investments.

38.     Cognizant of this leverage over Vantage, Su rejected an outright sale of the *Platinum Explorer* to the company, as had been initially contemplated, and insisted instead on forfeiture of the ship to him. Under the force of Su's control, Vantage was compelled to enter into a joint venture structure with Su. Su would not agree to a 50/50 split. Rather, he insisted upon retaining control over the asset and required that he sell Vantage only a 45% minority equity interest in Mandarin, Su's holding company, whose sole asset was the *Platinum Explorer* construction contract. Thus, although Vantage had contracted with Mandarin for an outright acquisition of the *Platinum Explorer*, Su was unwilling to convey the asset on those terms.

39.     Vantage once again was forced to relent and acquiesce in Su's demand for the minority joint venture structure. The company did so, but subject to important conditions: That Su promise to fund 100% of the two remaining 5% installment payments ($32 million each), and that Vantage and Su would share—according to their respective 45/55 ownership interests in Mandarin, all remaining development costs (approximately $90 million) as well as the final "completion" payment for the *Platinum Explorer* (approximately $504 million). Su agreed to these express conditions. Indeed, Su represented to Vantage that he had arranged bank financing to fund 100% of the two remaining 5% installment payments, as well as his 55% share of ongoing development costs for the *Platinum Explorer*.

15

40.    On November 18, 2008, Vantage Deepwater Company, a Vantage affiliate, signed the 55/45 joint venture with Su, based on Su's explicit assurance that he was capable of, and intended to pay as they accrued his share of ongoing costs for the *Platinum Explorer*. Specifically, the terms of the deal provided that Su would exercise 25 million warrants for Vantage stock, which he had obtained through the transactions consummated on June 12, 2008. Vantage then issued Su approximately 1.9 million additional warrants for Vantage stock, and applied the proceeds from Su's exercise of 25 million warrants (approximately $150 million), together with $40 million in previous payments made to Su,[5] in payment for a 45% interest in Mandarin, whose sole asset was the *Platinum Explorer* construction contract with DSME.

41.    Several months later, on February 3, 2009, Vantage announced an important and positive business development: it had secured a five-year lease from Oil and Natural Gas Company ("ONGC"), India's national oil company, for the *Platinum Explorer*.  In its press release, Vantage announced that the expected revenues under that contract over its five-year term were approximately **$1.1 billion**.  This was a critical milestone for Vantage, as it placed the company one giant step closer to becoming an established deepwater drilling contractor.

42.    This long-term, high-dollar contract carried, however, not only the potential for great reward, but also a significant risk: if Vantage did not mobilize the *Platinum Explorer* by the end of the fourth quarter of 2010, ONGC could bring a massive suit for breach of contract against Vantage.  Furthermore, Vantage was required to post a $17 million performance bond to ONGC at the time of closing, which it stood to lose if the *Platinum Explorer* was not delivered to ONGC on schedule.

---

[5] These $40 million in previous payments consisted of an $8 million payment made in connection with the June 12, 2008 transactions and attributable to the option for the *Platinum Explorer*, and the $32 million payment which Su had demanded in September, based on his misrepresentation that a 5% installment payment was due to DSME "immediately."

Certified Document Number: 53120996 - Page 16 of 25

43.     In entering into the 45 / 55 joint venture, Vantage had relied upon its limited obligation to finance only its 45% proportionate share of the remaining development costs for the *Platinum Explorer* (and none of the remaining installment payments).  Su, however, had other plans for Vantage's obligations.  From November 18, 2008 through July 7, 2010, when Vantage would ultimately acquire Su's 55% interest in Mandarin, Su failed to make a single payment—***not a single dollar***—toward his share of *Platinum Explorer* costs.  Instead, Su left it to Vantage to cover his *Platinum Explorer* costs.

44.     As Vantage discovered, in Su's mind, there was nothing "joint" about this venture.  From the outset, Su never had any intention or ability to make the two remaining 5% installment payments or his proportionate 55% share of accruing development costs for the *Platinum Explorer*.  In fact, Vantage later discovered that Su had not obtained bank financing, as he had claimed, and had always known that he was incapable of and never intended to fund his share of these ongoing and significant *Platinum Explorer* costs.

45.     In short, Su had fraudulently induced Vantage into the joint venture structure—in which he maintained a 55% control position and thus the corresponding control of the drillship—in order to continue to enrich himself personally.  Su intended Vantage to fund his 55% share, in addition to its own.  Effectively, in these ways, Su viewed and utilized Vantage as his own personal bank.  From November 18, 2008 through July 7, 2010, Vantage made at least $4.4 million of payments which should have been paid by Su, based on his 55% proportionate share of the joint venture.  Vantage had never budgeted for 100% of the *Platinum Explorer* costs and as a result, the company was rapidly running out of cash by the early spring of 2010.

46.     At this point, Vantage faced a "bet the company" dilemma.  The *status quo* was unacceptable—Vantage could not afford to continue financing 100% of the *Platinum Explorer*

Certified Document Number: 53120996 - Page 17 of 25

development costs, and it was apparent that Su had no intention or ability to begin making his share of these payments, or to reimburse Vantage for its previous overpayments. The two remaining 5% installment payments would be due to DSME soon, and by all accounts it appeared that Su would default on those obligations as well.

47.     Therefore, Vantage faced a fundamental choice between (i) abandoning the *Platinum Explorer* altogether, or (ii) devising a way out of the joint venture structure. The implications of abandoning the *Platinum Explorer*, however, would have been disastrous to the company, as Vantage:

    a)    stood to lose $100 million of its investment in Mandarin;

    b)    stood to lose the $17 million bond posted on the ONGC contract;

    c)    faced a massive breach of contract suit by ONGC;

    d)    stood to lose its status as a deepwater drilling contractor;

    e)    stood to lose any chance of acquiring the *Titanium Explorer*; and

    f)    stood to lose its technical and operations team

48.     It became clear that Vantage's only viable option was to buy out Su's 55% stake in Mandarin and go it alone on the *Platinum Explorer*. Against this backdrop, Vantage was yet again forced to negotiate with Su for a way out of the very financial distress that Su himself had caused. Throughout the course of these negotiations with Su in the first-half of 2010, Su's view of his fiduciary obligation to Vantage remained unchanged: Su was interested only in enriching himself, and demonstrated a complete and callous disregard for the best interests of the company and its shareholders.

49.     As negotiations continued into the spring of 2010, Su would represent that he was comfortable with the terms of a particular buyout deal, only to then re-trade his previous position

Certified Document Number: 53120996 - Page 18 of 25

in an attempt to extract more value for himself. As a result, the negotiations dragged on for months, and, as Su was well aware, Vantage's cash position continued to erode. By July 2010, Vantage had invested over $120 million in equity in Mandarin, all of which it stood to lose if Mandarin defaulted on its ongoing obligations to DSME.

50.     On July 7, 2010, Vantage finally publicly announced that it had reached a deal with Su: Vantage would pay approximately $140 million to Su in exchange for Su's 55% interest in Mandarin. This purchase price included a windfall to Su of approximately $60 million— above and beyond the payments that Su would ultimately make toward the *Platinum Explorer* installment payments and development costs. This so-called "premium" was paid in the form a $60 million convertible note issued by Vantage to Su, which remains in place today.

### Su's Fraud Continues With Respect to the *Titanium Explorer:*

51.     Su's misrepresentations were by no means limited to the *Platinum Explorer* drillship. In the initial transaction with Su, which closed on June 12, 2008, Vantage had received an option to acquire a second drillship from Su, the *Titanium Explorer*. As described earlier, this option expired unexercised in January 2009, thereby enriching Su with 7.3 million additional shares of Vantage stock. At that time, and as a result of Su's misconduct, Vantage simply lacked the financial wherewithal to acquire the *Titanium Explorer* outright.

52.     Instead, in March of 2009, Vantage Deepwater Company entered into construction supervision and management agreements with Su-controlled entities for the *Titanium Explorer*. Although Vantage Deepwater would not acquire the *Titanium Explorer* itself, these agreements provided that Vantage Deepwater would manage the construction and operation of the *Titanium Explorer*, in exchange for various fees. Under the management agreement, for example, Vantage Deepwater had a number of marketing and operational

19

Certified Document Number: 53120996 - Page 19 of 25

responsibilities for the *Titanium Explorer*, including an obligation to seek out contracts with operators.

53.     In March of 2009, Vantage carried out its marketing obligations by securing an eight-year contract with Petrobas, the national oil company of Brazil.  This contract called for deployment of the *Titanium Explorer* to the Gulf of Mexico by December 2011.  As with Vantage's contract with ONGC for the *Platinum Explorer*, the expected revenues on the Petrobas contract were enormous: approximately **$1.6 billion** over the eight-year contract term.  Again, however, Vantage, not Su, entered into the contract with Petrobas.  Therefore, if the *Titanium Explorer* was not delivered on time to Petrobas, Vantage, not Su, would face a massive breach of contract suit from Petrobas.

54.     Vantage entered into the construction supervision and management agreements with Su in reliance upon Su's representations that the management payments (including tens of millions of dollars for equipment and supply orders placed with vendors) due to Vantage under those agreements would be paid on time.  Vantage entered these agreements in further reliance on Su's representations that the Su-controlled entities which executed those contracts were capable of making and intended to make such payments.  As the rest of 2010 and early 2011 would prove, however, Su had misrepresented his intent and ability to ensure that the obligations to Vantage were performed.

55.     The overdue payments owed under the construction supervision and management agreements began to mount quickly, totaling at least $19 million as of January 31, 2011.  Su, however, refused to ensure that these payments were made, as he had represented to Vantage he would do.  Once again, Su sat idly by as Vantage was driven into another liquidity crisis.  On April 14, 2011, Su decided to step down from Vantage's board of directors.  The unpaid fees,

however, continued to pile up.  By December 31, 2011, Su's overdue payments totaled at least $23 million.  Many vendors not paid for *Titanium Explorer*'s equipment and supplies refused to supply Vantages operating rigs unless Vantage brought the accounts current.  Su refused to allow Vantage to raise capital for these liquidity needs and voted against a share capital increase.

56.   As with the *Platinum Explorer*, the only way to avoid the catastrophic consequences of breaching a contract with an operator (here, Petrobas) was to acquire the *Titanium Explorer* from Su outright.  On March 20, 2012, Vantage announced that it had finally reached an agreement to acquire the *Titanium Explorer* from Su.  Under that agreement, Vantage would pay Su approximately $630 million in cash.  As in the past, Su's web of lies and deception had served to personally enrich him, to the detriment of Vantage and its shareholders.

## V.
## APPLICABLE LAW

57.   Under Texas' internal affairs doctrine, the law of the Cayman Islands will govern Su's duties in his capacity as a Vantage director from June 12, 2008 through April 14, 2011. *See* TEX. BUS. ORG. CODE § 1.102 ("If the formation of an entity occurs when a certificate of formation or similar instrument filed with a foreign governmental authority takes effect, the law of the state or other jurisdiction in which that foreign governmental authority is located governs the formation and internal affairs of the entity.").

58.   Like its British and American counterparts, Cayman law unflinchingly recognizes that corporate directors owe, and cannot waive, the core fiduciary duties of loyalty, honesty, and good faith to the companies which they serve. *See, e.g., Hayat v. Al-Mazeedi*, No. 08-1004, 2011 WL 1532109, *3 (Mass. Sup. 2011) ("As in American law, the British and Cayman authorities unflinchingly characterize the relationship between a director and the corporation as fiduciary in nature.") (citing a Cayman case, *Cayman Islands News Bureau Limited v. Cohen and*

Certified Document Number: 53120996 - Page 21 of 25

*Cohen Assocs. Ltd.*, [1989-1990] CILR 195, explaining that corporate directors are held to "general standards of loyalty, good faith, and the avoidance of a conflict of duty and self interest").

59.    As a Vantage director, Su flagrantly disregarded his core fiduciary duties to Vantage to act honestly, in good faith, and in the *bona fide* best interest of Vantage and its shareholders.  His repeated schemes to defraud Vantage and its shareholders have caused both great damage to Vantage and great personal enrichment to Su.  The law of the Cayman Islands does not condone or permit such conduct on behalf of a corporate director, nor would the law of any country.  This lawsuit seeks to remedy the damage done to Vantage, and to recover the unjust enrichment and direct and indirect benefits that Su has received as a result of his misconduct and repeated violations of his fiduciary duties.

## VI.
## CAUSES OF ACTION

## A. Breach of Fiduciary Duty

60.    All prior paragraphs are incorporated herein by reference.  Vantage is entitled to damages and disgorgement of profits received by Su as a result of Su's breaches of his fiduciary duties to Vantage.

61.    As a Vantage director, among the duties Su owed Vantage were the fiduciary duties of loyalty, good faith, candor, and honesty.  Su breached his fiduciary duties by acting dishonestly and in bad faith, and by repeatedly placing his personal interests above the *bona fide* best interests of Vantage.  Su's bad faith and dishonest conduct included, *inter alia*, his material misrepresentations regarding (i) the payment terms of the construction contract with DSME for the *Platinum Explorer*; (ii) the due date of the $32 million installment payment owed to DSME on the *Platinum Explorer* construction contract; (iii) Su's ability and intent to ensure that Su-

Certified Document Number: 53120996 - Page 22 of 25

controlled entities would pay 100% of the two remaining installment payments and 55% of ongoing development costs under the *Platinum Explorer* joint venture; and (iv) Su's ability and intent to ensure that Su-controlled entities would pay Vantage the fees owed to it under the *Titanium Explorer* construction supervision and management agreements. Vantage suffered injury as a result of Su's breaches of his fiduciary duties. Su benefitted personally as a direct and indirect result of his breaches of his fiduciary duties to Vantage.

62.     Vantage seeks damages relating to, and stemming from, Su's breach of fiduciary duty, including without limitation, court costs, actual damages, exemplary damages, and attorneys' fees.

63.     Vantage seeks disgorgement of all profits and benefits, direct or indirect, received by Su through his breach of fiduciary duty.

64.     Vantage seeks a constructive trust for all profits and benefits, direct or indirect, received by Su through his breach of fiduciary duty.

65.     Vantage seeks an equitable accounting for all profits and benefits, direct or indirect, received by Su through his breach of fiduciary duty.

### B.   Fraud, Fraudulent Inducement, and Negligent Misrepresentation

66.     All prior paragraphs are incorporated herein by reference. Vantage is entitled to damages for Su's fraud, fraudulent inducement, and negligent misrepresentation.

67.     Su made material representations, *inter alia*, regarding (i) the payment terms of the construction contract with DSME for the *Platinum Explorer*; (ii) the due date of the $32 million installment payment owed to DSME on the *Platinum Explorer* construction contract; (iii) Su's ability and intent to ensure that Su-controlled entities would pay 100% of the two remaining installment payments and 55% of ongoing development costs under the *Platinum Explorer* joint

23

venture; and (iv) Su's ability and intent to ensure that Su-controlled entities would pay Vantage the fees owed to it under the *Titanium Explorer* construction supervision and management agreements.  Those representations were false.  Upon information and belief, Su was aware that those representations were false when they were made or, in the alternative, made those representations recklessly or negligently without any knowledge of the truth and as positive assertions.  Su intended that Vantage rely on his representations.  Vantage did in fact rely on those representations.  Vantage suffered injury as a result.

### C. Unjust Enrichment

68.    All prior paragraphs are incorporated herein by reference.   Because Vantage relied on Su's misrepresentations, and because of Su's unlawful conduct, Su has been unjustly enriched by being allowed to retain the profits and benefits from those misrepresentations, including without limitation (i) Vantage stock and warrants; (ii) Su's corporate control preferences, including his ability to nominate four individuals to Vantage's board of directors; (iii) the $60 million note issued to Su; and (iv) any payments to Su made in reliance on Su's misrepresentations and material omissions.  Vantage seeks a constructive trust on these profits and benefits, direct or indirect, to prevent the unjust enrichment of Su at Vantage's expense.

### VII.
### DEMAND FOR JURY TRIAL

69.    Plaintiff demands a jury trial and tenders the appropriate fee.

Certified Document Number: 53120996 - Page 24 of 25

## VIII.
## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that Defendant be cited to appear and answer herein and that upon final trial, Plaintiff have:

1) Judgment against Defendant in an amount within the jurisdictional limits of the Court;

   a. Judgment imposing a constructive trust upon all profits or benefits, direct or indirect, obtained by Su;

   b. Judgment requiring a full accounting by Su to Vantage for all profits or benefits, direct or indirect, obtained by Su;

2) Prejudgment and post judgment interest as provided by law;

3) Punitive damages;

4) Actual and court costs; and

5) Such other and further relief, general and special, legal and equitable, to which Plaintiff may be justly entitled.

Respectfully Submitted,

**MITHOFF LAW FIRM**

By: *Richard W. Mithoff / signed by permission. RCG*
Richard W. Mithoff
State Bar No. : 14228500
Sherie P. Beckman
State Bar No. 16182400
Warner Hocker
State Bar No. 24074422
500 Dallas Street
One Allen Center
Suite 3450
Houston, TX 77002
Telephone: 713-654-1122
Facsimile: 713-739-8085

**GIBBS & BRUNS, LLP**

By:
Robin C. Gibbs
State Bar No. 07853000
David Sheeren
State Bar No. 24079313
1100 Louisiana, Suite 5300
Houston, Texas 77002
Telephone: 713-650-8805
Facsimile: 713-750-0903

**ATTORNEYS FOR PLAINTIFF VANTAGE DRILLING COMPANY**

25

Certified Document Number: 53120996 - Page 25 of 25



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   October 1, 2012

Certified Document Number:        53120996 Total Pages:  25

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**