UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Vantage Drilling Company, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action 4-12-cv-03131 |
| versus | § | |
| | § | |
| Hsin-Chi-Su, aka Nobu Su, | § | |
| | § | |
| Defendant. | § | |

### PLAINTIFF'S MOTION FOR LEAVE
### TO CONDUCT EXPEDITED DISCOVERY

TO THE HONORABLE JUDGE HUGHES:

1. As fully set out in Vantage's Motion to Remand [Docket No. 6, filed Nov. 2, 2012], and as argued at the hearing on Nov. 5, 2012, Plaintiff Vantage Drilling Company ("Vantage") continues to vigorously contest federal subject matter jurisdiction in this case. Therefore, Vantage again respectfully urges the Court to remand this case to state court.

2. Pending a ruling on the Motion to Remand, however, and without waiving any rights or arguments with respect to this Court's subject matter jurisdiction, information has come to Plaintiff's attention which requires Vantage to move for leave to conduct expedited discovery. The discovery sought, by way of oral deposition, document requests and subpoenas, is limited to Defendant Hsin-Chi Su's ("Su") recent actions related to the approximately 100.3 million shares of Vantage stock that are the subject of this suit (the "Subject Stock").

3. Specifically, since filing this suit against Su in August 2012, Vantage has learned that the Subject Stock has become at risk of being transferred, liquidated or otherwise encumbered, such that Su could render himself judgment proof and undermine the principal relief sought in this case. Among other things, Vantage has learned that, since August 2012, Su

1

has apparently (1) caused the Subject Stock to become encumbered by various legal and financial entanglements around the globe, which reflect that Su and his companies may be in financial distress; (2) received an **18-month prison sentence from the London High Court for contempt of court**, and (3) committed or sought to commit the Subject Stock to an agreement with others to gain control over the maintenance of this suit, toward the obvious objective of directing its dismissal and creating a further opportunity to personally enrich himself at the expense of Vantage's shareholders.

4. These actions by Su, in light of this pending litigation, not only present fraudulent transfer issues, but also likely constitute a violation of the Voting Agreement and Irrevocable Proxy signed by the parties on March 20, 2012. Vantage respectfully asks the Court to allow the depositions, and access to accompanying documents, of four key witnesses on these issues, to explore and bring to light Su's use and disposition of the Subject Stock.

## I.
## FACTUAL BACKGROUND AND ARGUMENT

5. At the core of Vantage's case against Su is his wrongful acquisition of the Subject Stock. Vantage's 25-page Original Petition demonstrates that Su repeatedly violated his fiduciary duties to Vantage over the period of several years, from 2008-2011, and that the Subject Stock was the ***main fruit*** of his deception. During that period, "[t]hrough a series of misrepresentations, material omissions and outright lies to Vantage, Su used his fiduciary position for the sole purpose of self-enrichment" and "through his repeated dishonest and bad faith conduct, Su [] obtained approximately 100 million shares of Vantage Stock." *See* Original Petition at ¶ 6. The Original Petition provides exhaustive detail regarding Su's violations of his fiduciary duties, and the Original Petition is fully incorporated herein.

6. In addition, on March 20, 2012, Vantage entered into a Voting Agreement and Irrevocable Proxy (the "Voting Agreement") with Su and F3 Capital, a company owned and controlled by Su and incorporated in the Cayman Islands. A copy of the Voting Agreement is attached as Exhibit 1 to the accompanying Affidavit of David M. Sheeren ("Sheeren Affidavit").

7. The Voting Agreement was executed in connection with Vantage's March 2012 purchase of the *Titanium Explorer* drillship from Su, as described in ¶¶ 51-56 of the Original Petition. Indeed, the Voting Agreement itself states that Su's execution of the Agreement was a material inducement to the willingness of Vantage to purchase the *Titanium Explorer* drillship from Su.[1]

8. For the 12-month period following the execution of the Voting Agreement (that is, from March 20, 2012 through March 20, 2013), Su is prohibited from acquiring additional shares of Vantage "to the extent that such acquisition would cause the aggregate holding of ordinary shares in [Vantage] owned by [Su and his affiliates] to exceed 34.6% of the total number of issued and outstanding ordinary shares of [Vantage]." *See* Voting Agreement at § 4(a). Thus, through the Voting Agreement, Su promised Vantage that he would not increase his Vantage shareholdings above and beyond his current ownership.

9. Likewise, Su promised in the Voting Agreement that during the same 12-month window, he would not "Transfer" any of the Subject Stock to a third party unless he first notified Vantage and the third party agreed to be bound by the Voting Agreement. *Id.* at §4 (a). Under the Voting Agreement, the term "Transfer" is defined broadly to include not only any sale of

---

[1] *See, e.g.*, the Voting Agreement at Fourth Whereas Clause ("[A]s a material inducement to the willingness of [Vantage] to enter into the [*Titanium Explorer*] Purchase Agreement, [Vantage] desires that [F3 Capital] and [Su] execute this Agreement to vote [the Subject Shares] for election of the Initial Proposed Directors . . . at Each Nomination Meeting . . . and to incur the obligations set forth herein.").

stock, but also any action which would encumber, place the Subject Stock in a "trust," or otherwise limit Su's "right or power to vote" the Subject Stock. Importantly, "Transfer" is also defined to encompass any *offer* to sell, encumber, or place the Subject Stock in a trust. Specifically, "Transfer" includes:

> ". . . with respect to any security, the direct or indirect assignment, sale, transfer, tender, exchange, pledge, hypothecation, or the grant, creation, or suffrage of a lien, security interest, or **encumbrance** in or upon, or the gift, grant **or placement in trust**, or the Constructive Sale or **other disposition of such security . . . or any right, title, or interest therein** (**including any right or power to vote** to which the holder thereof may be entitled, whether such right or power is granted by proxy or otherwise) . . . [and] **the offer to make such a sale, transfer, Constructive Sale, or other disposition**." *See* Voting Agreement at § 7 ("Certain Definitions") (emphasis added).

10. Based on events that have come to light since Vantage filed suit in August 2012, Vantage is deeply concerned that Su may be in breach of his commitments under the Voting Agreement not to "Transfer" the Subject Stock. Specifically, Vantage has learned that Su may have:

> (1) Caused the Subject Stock to become encumbered through various legal and financial entanglements around the globe (a violation of the Voting Agreement), which indicate that Su and his companies may be in financial distress (*see* ¶¶ 13-16, below); and

> (2) Committed or offered to commit the Subject Stock, through a "voting trust" or similar means, to an effort to gain control over the maintenance of this lawsuit (a violation of the Voting Agreement) (*see* ¶¶ 17-24, below).

11. As stated above, not only would these actions likely constitute violations of the Voting Agreement, they would also risk undermining Vantage's ability to recover the Subject Stock—the principal relief sought in this case—in the event of a judgment against Su. In effect, Vantage is concerned that Su's recent actions threaten, and indeed may be *designed*, to render Su "judgment proof" in this case.

12. The Court has broad authority under the Federal Rules of Civil Procedure to manage the discovery process. *See, e.g.*, Rules 26(d); 16(b)(3)(B); and 16(c)(2)(F). Indeed, Rules 26(d)(1) and 30(a)(2)(A)(iii) explicitly permit a party to take depositions and seek discovery from any source, before the parties have conferred, when authorized by a court order. The court may order expedited discovery if there is some showing of good cause to justify the order. *See El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.*, 344 F.Supp.2d 986, 991 (S.D. Tex. 2004) (Ellison, J.), citing 8 C. Wright, A. Miller & R. Marcus, FEDERAL PRACTICE AND PROCEDURE §2046.1 (1994). Here, because good cause exists, and because the requested discovery is narrow in scope, Vantage requests that the Court grant its Motion for Leave to Conduct Expedited Discovery.

### I(A).
### SU'S RECENT LEGAL AND FINANCIAL ENTANGLEMENTS

13. Since Vantage filed this lawsuit in August 2012, Su and his companies, including his principal holding company, "Today Makes Tomorrow" (or "TMT"), have become embroiled in a multitude of legal and financial disputes around the globe, one of which recently led the London High Court to impose an ***18-month prison sentence against Su for contempt of court***. Indeed, as detailed below, numerous public reports have indicated that Su and TMT are in serious financial trouble. Given Su's apparent financial distress, Vantage is concerned that there is a *heightened* risk that Su may continue to seek to transfer, liquidate, or otherwise encumber the Subject Stock—currently valued at over $162 million[2]—in further violation of the Voting Agreement and in an attempt to make himself "judgment proof" in this case.

14. In recent months, Vantage has been ***inundated*** with legal correspondence and news reports reflecting Su's legal and financial entanglements around the globe which may have

---

[2] Based on the February 21, 2013 closing price of $1.62 per share and Su's 100,262,643 shares.

encumbered, or threaten to encumber, the Subject Stock.  Below is a summary of just some of those reports:

A. **Su Defaults on Contract With DSME Shipbuilder ($270 Million)**

In **May 2012**, Su's principal holding company, TMT, defaulted on payments for two crude oil carriers Su had contracted to purchase for a combined **$270 million** from South Korea's Daewoo Shipbuilding & Marine Engineering shipyard ("DSME"). Notably, DSME is the same shipyard which built Vantage's *Platinum Explorer* and *Titanium Explorer* drillships, as described in Vantage's Original Petition at ¶ 11-13.  In light of Su's default, DSME confiscated Su's 10% deposit and auctioned off the ships to third parties, *the very fate that Vantage feared with respect to its own drillships*.  *See, e.g.*, Original Petition at ¶¶ 27, 47-49.

In typical fashion, Su commented that DSME's confiscation of the deposit was "***quite a cheap penalty***."  *See* Lucy Hine, *TMT Boss Forfeits Deposit on 'Elephant' VLCCs*, TRADEWINDS, Sept. 19, 2012 (attached as Ex. 2 to Sheeren Affidavit). Furthermore, upon information and belief, Vantage understands that Su or his companies may have ***pledged*** the Subject Stock as collateral under various performance guarantees to DSME.  Given DSME's substantial losses on this transaction, Vantage is therefore concerned that DSME may seek recourse to the Subject Stock under such guarantees. *See* YoungSoo Han, *Uncertainties Linger,* SAMSUNG SECURITIES, Aug. 30, 2012, at 2 (attached as Ex. 3 to Sheeren Affidavit) (noting that Su's default may have caused DSME losses of $76 million).

B. **Su Defaults on Contract With Hyundai Mipo Shipbuilder ($37 Million)**

In **August 2012**, Su-controlled TMT again defaulted on payments for a bulk ship Su had contracted to purchase for **$37 million**, this time from South Korea's Hyundai Mipo shipyard.  In light of Su's default, the shipyard sold the ship to a third party at a loss of many millions of dollars.  *See* Gillian Whittaker, *Cosmoship In Frame For Handysize Resale*, TRADEWINDS, Sept. 12, 2012 (attached as Ex. 4 to Sheeren Affidavit).

C. **Su Defaults on Contract With Hyundai Heavy Shipbuilder ($650 Million)**

In **October 2012**, Su-controlled TMT once again defaulted on payments for 12 bulk carrier ships Su had contracted to purchase for **$650 million** from another South Korea shipbuilder, called Hyundai Heavy.  A TMT spokesman admitted that Su fell behind on the payments, commenting to Reuters News that, "[w]e did not make payments for the ships and the shipbuilder wants to resell them in the market."  Indeed, Su himself commented to Reuters News that "[w]e are going through a very hard time . . . ."  *See* Alison Leung, ***Taiwan's*** *TMT Defaults on Payment for Hyundai Orders Worth $650 Mln*, REUTERS, Oct. 15, 2012 (attached as Ex. 5 to Sheeren Affidavit).

D.  **Su Sentenced to 18 Months in Prison in Dispute With NewLead ($16 Million)**

In **November 2012**, <u>**Su was sentenced to eighteen months in prison for contempt by the London High Court**</u> in a case related to Su's unpaid charter fees for a vessel owned by a Greek shipping company called NewLead Holdings. Specifically, Su and his companies were found liable to NewLead Holdings in five separate arbitrations for over **$16.4 million** in damages and other costs. In October 2012, the English court ordered Su-controlled TMT to make a "full asset disclosure," but Su failed to do so. Su then further flouted the Court by failing to appear at multiple hearings, prompting the contempt citation and eighteen month prison sentence. *See* Jason O'Connell, *Nobu Gets 18 Months*, TRADEWINDS, Nov. 9, 2012 (attached as Ex. 6 to the Sheeren Affidavit); *see also* HELLENIC SHIPPING NEWS WORLDWIDE, *NewLead Holdings Ltd. Announces Fifth Favorable Arbitration Award Against TMT Bulk Corp.*, Dec. 10, 2011 (attached as Ex. 7 to the Sheeren Affidavit).

Despite Su's **eighteen-month prison sentence**, NewLead Holdings, the plaintiff in that case, has vowed to move forward with efforts to collect **$16.4 million** against Su's assets held in the UK. *See* Jason O'Connell, *NewLead to Fight On,* TRADEWINDS, Nov. 9, 2012 (attached as Ex. 8 to the Sheeren Affidavit).

E.  **Su Becomes Subject of World-Wide Asset Freeze in Lakatamia Suit ($48 Million)**

In **December 2012**, Vantage received a letter from a European law firm informing Vantage that the English High Court had issued a world-wide freezing order against Nobu Su, TMT, and his companies, in the amount of approximately **$48.8 million.** This freezing order related to a suit brought by Lakatamia Shipping Company Ltd., a Greek shipping company, against Nobu Su, TMT, and Su's companies for Su's breach of a "Forward Freight Agreement," a specialized shipping contract.

The freezing order specifically directs Su not to "dispose of, deal with or diminish the value of any of [Su's] assets whether they are in or outside of England and Wales up to [$48,824,440.24]." *See* Freezing Order at § 2(2) (attached as Ex. 9 to the Sheeren Affidavit).

F.  **Su Requests Extensions on Nearly a Billion Dollars in Bank Loans**

In **January 2013**, Su-controlled TMT requested its creditor bank to extend loan repayment periods for several deals worth a combined **$800 million**. One trade publication noted that TMT, "run by Nobu Su," was "[f]inancially troubled" and "has seen a number of court cases brought against it across the world in recent months." *See* PORTNEWS, *Taiwanese Shipping Company Asks Bank to Extend Loan Repayment Period*, Jan. 22, 2013 (attached as Ex. 10 to the Sheeren Affidavit).

7

### G. Su Pledges 12.1 Million of the Subject Shares to The Royal Bank of Scotland

Finally, in August 2008, Su pledged 12,148,858 of the Subject Shares as collateral on a loan from The Royal Bank of Scotland PLC (or "RBS"), under a "Pledge Agreement" (attached as Ex. 11 to the Sheeren Affidavit). Upon information and belief, Vantage understands that, **in recent months**, RBS may have notified Su that he and his companies are in breach of their obligations under the Pledge Agreement, and that RBS may have sought to enforce its security interest in some or all of the Subject Shares pledged as collateral. Vantage seeks expedited discovery, in part, to understand the legal status of the Subject Shares which Su pledged as collateral under that loan, and to shine light on Su's compliance with his obligations under the RBS Pledge Agreement.[3]

15. These widespread reports indicate that in the eleven months following the execution of the Voting Agreement, Su has likely breached his obligation not to "Transfer"—that is, not to "encumber" the Subject Stock. *See* ¶¶ 9-10, above. These reports also indicate that Vantage's experiences with Su are not unique, and that Su has continued to engage in a habit or pattern of disavowing his commitments—whether contractual or fiduciary in nature—with a variety of third parties. In total, between May 2012 and October 2012, Su has apparently defaulted on contracts for the construction of at least *fifteen ships*, with *three* separate shipyards, with an aggregate contract value of nearly *$1 billion*.[4]

16. As described below at ¶¶ 25-26, Vantage seeks an expedited deposition of Su, and related document discovery, to determine the degree to which these legal and financial entanglements may have already encumbered, and may continue to encumber, the Subject Stock and potentially put them in whole or part beyond the jurisdiction of the American court which will ultimately try this case.

---

[3] If Su has breached his obligations under the RBS loan, he probably also thereby breached his covenant under the Voting Agreement not to "Transfer"—that is, not to "encumber"—the Subject Stock. *See* ¶¶ 9-10, above.

[4] *See* ¶ 14, above; *see also* Original Petition at ¶ 6 ("Su's misrepresentations . . . were actually just the first in a series of Su's bad faith misrepresentations and material omissions in his dealings with Vantage. In complete disregard of his fiduciary duties of loyalty, good faith, candor, and honesty, Su continually devised new schemes to personally enrich himself at the expense of Vantage and its shareholders.").

## I(B).
## SU'S EFFORTS TO COMMIT THE SUBJECT STOCK TO A VOTING TRUST OR SIMILAR MEANS TO GAIN CONTROL OVER MAINTENANCE OF THIS SUIT

17. Vantage has also recently learned that Su may have violated the Voting Agreement by committing, or offering to commit, the Subject Stock, through a "voting trust" or similar means, to an effort to gain control over the maintenance of this lawsuit, toward the obvious objective of directing its dismissal and creating a further opportunity to personally enrich himself at the expense Vantage's shareholders. In part because the full extent of this effort is currently unknown to Vantage, Vantage seeks limited and expedited discovery to shine light on this scheme.

18. Specifically, on November 9, 2012, Robert F. Gray, Jr., Su's long-time adviser at Mayer Brown, sent an e-mail to Su and one of Vantage's employees, Benjamin Shaw (the "Gray E-mail"). A copy of the Gray E-mail is attached as Exhibit 12 to the Sheeren Affidavit.[5] The Gray E-mail, in turn, forwarded an underlying November 8, 2012 e-mail from Randy Stilley to Gray (the "Stilley E-mail").

19. In the Stilley E-mail, Stilley explained to Gray that Stilley had received a call from someone named Keith Meyer, and that "Keith indicated that he had **been in contact with Nobu Su regarding Vantage**, and that Nobu wanted to find a way to **gain control of the company** and replace management." *Id.* (emphasis added). The Stilley E-mail also explained that, according to Keith, "**Nobu wants to find someone to join him by purchasing some stock so that together they have 50% of the shares** and then force out [the CEO] and his team." *Id.* (emphasis added). Finally, Stilley suggested to Gray that Stilley could "get involved" with Su's effort, with Stilley serving as Vantage CEO. *Id.*

---

[5] This e-mail is clearly not a privileged communication, because it was sent to Benjamin Shaw, a contract employee of Vantage. To the extent the communication with Su may have otherwise been privileged, that privilege was waived when the communication was shared with a third party.

9

20. The next day, in the "Gray E-Mail," Gray forwarded the Stilley E-mail to Su and Benjamin Shaw and indicated that Gray and Stilley had lunch that day to discuss the subject of the Stilley E-mail. *Id.* The Gray E-mail further indicated that Su "should consider a plan forward to perhaps **first put them on the Board of Vantage** with a view to taking over Vantage after March 20, 2013 once your standstill and voting agreement have ended." *Id.* Gray then suggested that Su should consider "coming to Houston to meet with them and develop a detailed **plan of attack**." *Id.* (emphasis added).

21. Su's "plan of attack" appears to be in motion. On February 1, 2013, Su nominated Randy Stilley and Keith Meyer to Vantage's Board of Directors. *See* Letter from Robert F. Gray, Jr. to Vantage, dated Feb. 1, 2013 (attached as Exhibit 13 to the Sheeren Affidavit).

22. Given the Voting Agreement's clear prohibition on Su's encumbering or placing the Subject Stock in a voting trust, or *offering* to encumber or place the Subject Stock in a voting trust, Su's apparent scheme—in coordination with Stilley and Meyer—would likely constitute a breach of the Agreement. *See* ¶¶ 9-10, above. Indeed, the Gray E-mail appears to concede as much, by implying that the plan of attack could only be *completed* after the Voting Agreement expired. *Id.* But the attack, and therefore the contractual breach, already appears to be underway. Thus, Vantage seeks expedited discovery in part to uncover the extent to which Su may be in continuing breach of the Voting Agreement.

23. Raising additional concern, with respect to this lawsuit, is that Su's "plan of attack," appears to be orchestrated by Mayer Brown LLP, the very law firm representing Su in this case. Indeed, the Gray E-mail was sent three months after this lawsuit was filed. Therefore,

Vantage also seeks expedited discovery to determine whether Su's potential breach of the Voting Agreement is part of a *larger* (and potentially improper) defense to this lawsuit.

24. That is, Vantage is concerned that Su's "plan of attack" may be motivated by a desire to gain control over this lawsuit, only then to summarily dismiss it. Although such a scheme would constitute a brazen attempt to, yet again, inflict harm on Vantage's shareholders for the sole purpose of Su's own self-enrichment, this behavior would be consistent with Su's conduct as described in detail in Vantage's Original Petition.

## II.
## EXPEDITED DISCOVERY REQUESTED

25. Vantage requests that the Court grant it leave to conduct expedited depositions—that is, occurring **within 30 days** from the date of this Motion—of the following four individuals on the following topics:

**Witness**: **Nobu Su.**

**Topic/Scope**: As fully set forth in Exhibits A and C hereto, this deposition will focus on (1) the current legal status of the Subject Stock, including an inquiry into the existence of any encumbrances on the Subject Stock, and (2) communications between or among Randy Stilley, Keith Meyer, or Su relating to Vantage, the Subject Stock, or the Voting Agreement.

**Witnesses: Randy Stilley, Keith Meyer, and Robert F. Gray, Jr.**

**Topic/Scope**: As fully set forth in Exhibit B hereto, these three depositions will focus on communications between or among Nobu Su, Randy Stilley, Keith Meyer, or Robert F. Gray, Jr. relating to Vantage or the Subject Stock.

26. Vantage also requests that the Court grant it leave to serve the limited document requests and subpoenas, attached hereto as Exhibits B (subpoenas to Stilley, Meyer, and Gray) and C (document request to Su).

# III.
# CONCLUSION

27. For these reasons, Vantage respectfully requests the Court grant it leave to conduct the expedited discovery requested in ¶¶ 25 and 26, above.

Dated: February 26, 2013

Respectfully Submitted,

OF COUNSEL:

By: /s/ Richard W. Mithoff
Richard W. Mithoff
State Bar No. : 14228500
Southern District No. 2102
Sherie P. Beckman
State Bar No. 16182400
Southern District No. 11098
Warner V. Hocker
State Bar No. 24074422
Southern District No. 1133732
**MITHOFF LAW FIRM**
500 Dallas Street
One Allen Center, Suite 3450
Houston, TX 77002
Telephone: 713-654-1122
Facsimile: 713-739-8085

By: /s/ Robin C. Gibbs
Robin C. Gibbs
State Bar No. 07853000
Southern District No. 4790
**GIBBS & BRUNS, LLP**
1100 Louisiana, Suite 5300
Houston, Texas 77002
Telephone: 713-650-8805
Facsimile: 713-750-0903

**ATTORNEY-IN-CHARGE FOR PLAINTIFF**

OF COUNSEL:

David Sheeren
State Bar No. 24079313
Southern District No. 1339705
**GIBBS & BRUNS, LLP**
1100 Louisiana, Suite 5300
Houston, Texas 77002
Telephone: 713-650-8805
Facsimile: 713-750-0903

I hereby certify that a true and correct copy of the foregoing document was served on all counsel via Electronic filing and/or U.S. mail, pursuant to the Federal Rules of Civil Procedure and the Southern District's Local Rules, on this the 26th day of February, 2013:

***Via U.S. Mail and Email***
Mark D. Manela
mmanela@mayerbrown.com
Jessica Crutcher
jcrutcher@mayerbrown.com
Quinncy McNeal
qmcneal@mayerbrown.com
**Mayer Brown, LLP**
700 Louisiana, Suite 3400
Houston, Texas 77002-2730

           */s/ David Sheeren*
           David Sheeren