UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| VANTAGE DRILLING COMPANY, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | CIVIL ACTION 4-12-CV-03131 |
| versus | § | |
| | § | |
| HSIN-CHI-SU, AKA NOBU SU, | § | |
| | § | |
| DEFENDANT. | § | |

VANTAGE DRILLING COMPANY'S APPLICATION FOR
PRELIMINARY INJUNCTION AND
MOTION FOR EXPEDITED DISCOVERY

Plaintiff Vantage Drilling Co. ("Vantage" or the "Company") files this Application for a Preliminary Injunction barring Defendant Hsin-Chi-Su, aka Nobu Su ("Su"), from transferring, selling, pledging or otherwise encumbering any of the Vantage stock (the "VTG Shares") obtained as a result of his fraud and breaches of fiduciary duty to the Company, including by placing the shares into escrow to serve as collateral in an unrelated bankruptcy recently initiated by twenty-three insolvent foreign companies that are wholly-owned and controlled by Su. Vantage also renews its February 26, 2013 Motion for an expedited deposition of Su to discover the legal status of the VTG Shares and the existence of any encumbrances that may already have been placed on those shares.[1]

I.    INTRODUCTION

Vantage has long expressed its concern that Su intends to transfer or encumber the VTG Shares in order to obstruct the Court's ability to impose a constructive trust over them as a remedy for his fraud and self dealing while serving as a Vantage director.  These concerns have

---

[1] See generally Ex. 1 (Plaintiff's Motion for Leave to Conduct Expedited Discovery, filed February 26, 2013), which is incorporated as if fully set forth in this Application.

come to fruition in the context of a bankruptcy filed by twenty-three insolvent shipping companies (the "TMT Bankruptcy"), each of which are wholly-controlled and ultimately wholly-owned by Su himself (collectively, the "Debtors").[2]

Su has delivered or soon will complete delivery of 25 million VTG Share certificates to the TMT Bankruptcy Debtors' counsel, and proposes that they be accepted as collateral in connection with the Debtors' Chapter 11 restructuring plans.[3]  It is undisputed that the Debtors own no legal or equitable interests of any kind in the shares.[4]  Nevertheless, while Su has merely handed the VTG Shares over to their counsel, ***Debtors' counsel already asserts that it holds them in "escrow" for the Debtors*** and warns Vantage that any objections to Su's plan to encumber the VTG Shares may violate the Debtors' automatic bankruptcy stay.[5]  Moreover, on July 16, 2013, Su admitted in sworn testimony in the TMT Bankruptcy that another ***40 million*** of the VTG Shares are ***already*** subject to a security interest in favor of third parties, confirming Vantage's long-held fears that Su is actively attempting to place the VTG Shares beyond the reach of the Court.[6]

---

[2] Specifically, Su has caused 23 entities over which he holds sole control and ultimate ownership—including 17 special purpose entities each holding title to a single ship and six affiliated entities, to seek Chapter 11 bankruptcy protection in an action styled Cause No. 13-33740; *TMT Procurement Corp., et al.*; in the United States Bankruptcy Court for the Southern District of Texas ("The TMT Bankruptcy").

[3] *See* Ex. 2 (Excerpts of Transcript of July 16, 2013 TMT Bankruptcy Hearing before Judge Marvin Isgur) pp. 281:3-14; 282:22-283:3; 289:19-290:12; Ex. 3 (Expedited Motion to Approve Share Escrow Agreement filed August 6, 2013 in the TMT Bankruptcy) ¶ 2 (defining "Good Faith Property" to be pledged as "***non-estate property*** with a fair market value of $40,750.000" (emphasis added)).

[4] *See* Ex. 2 p. 275:9-13 (acknowledging that the VTG shares are not related to the TMT shipping interests).

[5] *See* Ex. 4 (Letter from Evan D. Flaschen to Joshua P. Agrons dated July 24, 2013) (asserting that Su's surrogate F3 Capital "has already placed certain of its VTG shares in escrow as a commitment to the Chapter 11 process" and cautioning Vantage "to consider your letter in context of 11 U.S.C. § 362").

[6] *See* Ex. 2 p. 272:20-24.

In short, Su has already taken actions to undermine this Court's jurisdiction over the disputed *res* of VTG Shares, and hopes to leverage the TMT Bankruptcy to encumber 25 million more VTG Shares.  Settled law provides that the Court has the power not only to determine the scope of its own jurisdiction, but also to enter provisional orders preserving the status quo while that question is being decided.   Vantage respectfully requests the Court to preserve its jurisdiction over the VTG Shares by enjoining Su from transferring, pledging or otherwise encumbering them in any way at least until the Fifth Circuit determines whether diversity jurisdiction exists over this case, and thereafter pending a final decision on the merits of Vantage's claims.

As shown below, Vantage has a substantial likelihood of success on the merits, and is faced with imminent, irreparable injury if Su's effort to pledge 25 million VTG Shares if the TMT Bankruptcy goes forward.  Indeed, Su's resort to the use of these shares—which have no connection to the TMT Bankruptcy other than Su's common control over the shares and the debtor entities—strongly suggests that Su has few if any other resources left capable of satisfying a future judgment in Vantage's favor.

The balance of hardships and considerations of public interest also support the entry of injunctive relief.  TMT Bankruptcy debtor entities themselves own no interests in the Vantage Shares, and Su cannot create such interests merely by delivering the shares to the Debtors' counsel.  Although Su told the bankruptcy court that his "pledge" of the VTG Shares shows his "good faith" in the TMT Bankruptcy, in fact he has tendered only shares obtained through fraud and breaches of fiduciary duty, and therefore held in trust for his injured beneficiary, Vantage.  In addition, the VTG Shares represent many multiples of Vantage's daily trading volume and vastly exceed the market's ability to absorb them without causing a substantial decline in the

Company's share price.  Su's plan would therefore compound the injuries that he has inflicted on Vantage's shareholders by devaluing their equity if the Debtors (who risk nothing through the pledge) default on their obligations.

Finally, Vantage respectfully renews its February 26, 2013 Motion for Expedited Discovery [Dkt. No. 17] to determine the status of *all* of the VTG Shares at issue in this case. The TMT Bankruptcy confirms Vantage's previous showing that Su's sprawling network of shipping interests is facing a financial collapse, and demonstrates that Vantage's grave concerns about the VTG Shares are well founded and that Su has already begun dissipating or encumbering the shares.  In the absence of the relief requested herein and targeted discovery into the status of his remaining shares, those assets may be far beyond the reach of this or any other court long before a final judgment is rendered.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

From start to finish, Su's association with Vantage was induced and characterized by fraud and self-dealing.  After defrauding Vantage in a June 2008 transaction through which Su became a Vantage director and its largest shareholder, Su ignored common law and fiduciary duties of candor and loyalty by inducing Vantage to structure its entire business strategy in reliance on Su's prior misrepresentations.

Once the truth inevitably came out, Su capitalized on the resulting financial crises by engaging in a series of self-interested transactions that were based on new falsehoods and material omissions to Vantage.  Having exploited his fiduciary role to extract approximately 100 million VTG shares and tens of millions of dollars in other benefits, the burden falls on Su to prove the entire fairness of these self-interested transactions.[7]  Under the facts set forth below, Su

---

[7] *See* Section III.B.1.a, *infra.*

4

cannot meet that burden, and this Court should enjoin any effort to place those shares beyond the reach of its equitable powers to remedy Su's misconduct.

### A. F3 Capital Obtained its Vantage Shares through a Series of Fraudulent, Self-Interested Transactions between Vantage and its Fiduciary, Nobu Su

Vantage was formed in September 2006 as a special purpose acquisition company with a plan to acquire a mix of conventional and cutting-edge deepwater oil and gas drilling assets that it could contract to operators around the world. *See* Ex. 5 (Affidavit of Christopher G. DeClaire) ¶ 2. Vantage sought a mix of conventional "jackup rigs" for oil and gas drilling operations in less than 350 feet of water, and advanced "ultra-deepwater" drillships capable of drilling in the open ocean in more than 10,000 feet of water. *Id.* Given the enormous cost and technical challenges associated with such operations, ultra-deepwater drillships are among the most advanced and expensive assets in the oil and gas industry, and would represent a significant competitive advantage once acquired by Vantage. *Id.*

Vantage's management was introduced to Su in 2007. *Id.* ¶ 3. Su is a resident of Taipei, Taiwan, and is the sole ultimate shareholder of F3 Capital, which now holds on his behalf the VTG Shares acquired through the fraud and self-dealing described below.[8] Relevant to this case, Su also controlled construction contracts on a portfolio of conventional and ultra-deepwater drilling equipment that closely matched Vantage's desired mix of assets. *Id.* These included contracts to build four "jackup rigs" that were under construction at PPL Shipyards Pte., Ltd. ("PPL") in Singapore, and two ultra-deepwater drillships known as the *Platinum Explorer* and

---

[8] *See* Ex. 2 (Excerpts of Transcript of July 16, 2013 TMT Bankruptcy Hearing before Judge Marvin Isgur) pp. 269:11-270:12 ("**Q:** What is F3 Capital? **A:** [Su]: F3 Capital is the shareholders of the drilling company in United States. **Q:** Okay. **A:** Listed in United States. **Q:** Who's the owner? **A:** Myself [Su], sir. ... **Q:** Is F3 Capital a shareholder in Vantage Drilling? **A:** Yes, sir.").

the *Titanium Explorer*, that were under construction at the Daewoo Shipbuilding & Marine Engineering ("DSME") shipyard in South Korea. *Id.*

As is described more fully below, Vantage entered into contracts to acquire Su's interests in those assets in reliance on material misrepresentations by Su regarding the terms of his contracts with DSME and both his ability and intent to perform those contracts. *See id.* ¶¶ 4-6, 8, 12-13. In the process, Vantage provided Su a seat for himself and two nominees on the Company's nine-member board of directors, and it paid Su a fortune in cash, warrants and Vantage stock. *Id.* ¶¶ 4-7, 12. Su's involvement ultimately proved disastrous for Vantage, triggering a cascade of financial crises that threatened the then-startup company's very existence. *See id.* ¶¶ 8-12, 14-16. As a Vantage director and the Company's largest shareholder, Su well knew that Vantage had to take immediate action to mitigate those crises, and that the Company almost certainly could not survive the time needed to pursue litigation against him. Su therefore compounded his original fraud and breaches of fiduciary duty and capitalized on Vantage's financial duress by fraudulently inducing the Company to enter into additional agreements that ultimately served only to enrich himself with additional cash and Vantage stock and warrants. *See id.* ¶¶ 10-12, 15-16.

The first of these transactions was announced on September 30, 2007, when Vantage entered into an agreement to acquire Su's construction contracts to build the four jack-up drilling rigs and an option to acquire the *Platinum Explorer*, one of the ultra-deepwater drillships under construction at DSME. *Id.* ¶ 4. The agreement was structured as a sale of 100% of the stock of Offshore Group Investments Ltd. ("OGIL"), an F3 Capital subsidiary whose sole asset consisted of the PPL contracts to build the jackup rigs, and an option to buy the *Platinum Explorer*. *Id.* In

exchange, Su was to receive more than $325 million in cash, stock and warrants issued at Su's direction to his wholly-owned entity F3 Capital. *Id.*

In March 2008, before this transaction closed, Vantage and Su modified their agreement to provide that Vantage would acquire the *Platinum Explorer* outright for approximately $676 million after construction was completed, and that Vantage would receive a second option to purchase her sister ship, the *Titanium Explorer*, which was also under construction at DSME. *Id.* ¶ 5. Under this new agreement, Su still controlled the DSME construction contract pending completion of construction through another wholly-owned subsidiary, Mandarin Drilling Co. ("Mandarin"). *Id.* ¶ 7. Following a shareholder vote and approval, the transaction closed on June 12, 2008. *Id.* Vantage's acquisitions of the *Platinum Explorer* and *Titanium Explorer* drillships were at the heart of Vantage's business plan to distinguish itself as one of a handful of ultra-deepwater drillship companies, and Vantage announced that the *Platinum Explorer* would become the "flagship" of its drilling fleet. *Id.* ¶ 6.

Su, in turn, obtained substantial control over Vantage from that point forward. *Id.* ¶ 7. As consideration for his fraudulent transaction, (1) Su joined the Vantage board of directors, (2) Su's designee F3 Capital became the single largest Vantage shareholder and (3) Su acquired the right to nominate two additional members to Vantage's board. *Id.* In addition, Su's wholly-owned subsidiary Mandarin maintained direct control over the *Platinum Explorer* construction contract with DSME. *Id.*

Su procured all of these benefits through fraud. Among other misrepresentations, Su misled Vantage with respect to the terms of the DSME contract to build the Platinum explorer, *claiming that he had already made a required 30% down payment of approximately $202 million for the* **Platinum Explorer**, and that an additional 70% would be due upon the ship's

completion.  *Id.* ¶ 8.  Under the March 2008 contract, Vantage was obligated to repay Su's 30% ($202 million) down payment by September 13, 2008.  *Id.* ¶ 5.  With Su now sitting on Vantage's board of directors, Vantage structured its business plans, financing arrangements, and eventually third party drilling contracts in reliance on Su's misrepresentations. *Id.* ¶ 8.  Further, Vantage immediately began planning a road show to obtain financing to cover its obligations to Su and others.  *Id.*

In connection with that effort, Vantage repeatedly requested that Su provide the Company with a copy of the DSME contract to verify those terms.   *Id.*  Su first delayed providing a copy of his contract, and then provided only a redacted version of the agreement that omitted the key payment terms.  *Id.*  Finally, on August 29, 2008—*the day before the road show was scheduled to begin*—Su provided a complete version of his DSME construction contract, which revealed that he had misrepresented the key terms of the contract.  *Id.*  Most notably, Su's representation that he had already made a $202 million down payment on the *Platinum Explorer* proved to be false.  *Id.*  Instead, the DSME contract required four installment payments of 5% ($32 million) each, and a final payment of 80% of the price upon completion of the ship.  *Id.* Vantage learned that Su's claim to have made a $202 million down payment on *Platinum Explorer* was also false, and instead *Su had made only one of those $32 million installment payments*. *Id.*

Su's effort to extract a $202 million down payment on the cost of *Platinum Explorer* in September 2008, plainly, was based on false pretenses.  As an immediate consequence, Vantage was forced to cancel its road show, causing severe damage to its reputation with its bankers.  *Id.* ¶ 9.  During the month that followed Su's admission, Vantage's shares lost approximately 55% of their value.  *Id.*   Then, like falling dominoes, Su's misrepresentations triggered a series of

8

crises for Vantage that threatened its ability to acquire the flagship *Platinum Explorer* and later the *Titanium Explorer*, and in turn would have exposed Vantage to catastrophic liability by rendering it unable to perform its own drilling contracts—including billion-dollar contracts with the national oil companies of India and Brazil. *Id.* ¶¶ 10-15.

Su's misconduct did not end with his initial acts of fraud, however. Indeed, only eight days after he finally disclosed the true terms of the DSME Contract, Su told Vantage that the next 5% installment was "immediately" due to DSME and that he had insufficient resources to make the $32 million payment. *Id.* ¶ 10. Vantage was therefore forced to repurpose $32 million earmarked to pay for the jackup rigs, injuring the Company's relationship with a syndicate of banks that had provided that financing. *Id.* Vantage soon learned that Su had lied even about the need for immediate payment of that amount, and that he had secretly obtained a deferral of the payment until October 31, 2008. *Id.* ¶ 11. Hence, Su effectively obtained an interest free loan for that amount, while needlessly placing Vantage into a financial crisis as it sought to replace those funds, once again on the basis of false pretenses.

Su's actions set the pattern for things to come. On this and numerous other occasions, Su manufactured financial crises that threatened the imminent loss of the Company's core drilling assets unless Vantage immediately acted to mitigate the situation under timeframes that precluded it from seeking relief through litigation. *See, e.g.*, *id.* ¶¶ 12-15. To cite only one of many such instances, Vantage was forced to restructure its agreements with Su after learning of Su's initial misrepresentations concerning the *Platinum Explorer*. *Id.* ¶ 12. Therefore, on November 18, 2008, it agreed to purchase a 45% equity stake in Mandarin Drilling Co. ("Mandarin"), another Su affiliate that controlled the DSME contract to build the *Platinum Explorer* as its sole asset, while Su retained a 55% share of the Mandarin. *Id.* Su benefitted

handsomely by the arrangement, *see id.*, and in exchange promised Vantage that he would cover each of the remaining $32 million progress payments due to DSME and would pay a proportionate, 55% share of all remaining costs associated with the ship. *Id.* Su repeatedly failed to meet his payment obligations, however, and Vantage later learned that Su had known from the outset that he was incapable of meeting his obligations. *Id.* ¶ 14. Vantage was ultimately forced to acquire Su's remaining 55% share of Mandarin in order to avoid default on the DSME contract, preserve the *Platinum Explorer*, and to avoid catastrophic liability that it would have suffered had it defaulted on multi-billion dollar contractual obligations to third-party drilling clients. *Id.* ¶ 15. Vantage paid Su $140 million for his remaining stake in Mandarin, which included a pure windfall to Su of approximately $60 million. *Id.* ¶ 16.

While these transactions represent only a few of many examples of Su's fraud and self-dealing towards Vantage, *id.* ¶ 18, they are sufficient to demonstrate that Vantage has a substantial likelihood of success on the merits in this action. *See generally* Section III.B1, *infra.* In short, the history of Su's relationship with Vantage presents a pattern in which: (i) Su misrepresented facts to induce Vantage to enter into contractual arrangements with him or companies controlled by him; (ii) Su's misrepresentations caused severe financial distress to Vantage, leaving it with no option under circumstances created by Su but to renegotiate its arrangements with Su—which were, again, induced by new misrepresentations at each new stage; and (iii) Su capitalized on Vantage's distress by further enriching himself at the expense of Vantage and its shareholders.

### B. Vantage Has Pending Claims in Litigation Against Su to Impose a Constructive Trust Over the Vantage Shares Held By F3 Capital

Su resigned his Vantage directorship effective April 14, 2011. *Id.* ¶ 17. Vantage initiated litigation against Su on August 21, 2012, alleging fraud and breaches of fiduciary and other

duties to Vantage.  *See generally* Ex. 6 (Plaintiff's Orig. Pet.).  Among other relief, Vantage's

petition seeks disgorgement and the imposition of a constructive trust over all profits that were

directly or indirectly received by Su in connection with his breaches of fiduciary duty, including

without limitation the millions of VTG Shares that were issued to F3 Capital at Su's direction.

*See id.* ¶¶ 60-68.

On October 22, 2012, Su removed this action from Harris County District Court, where

the suit was originally filed, to the United States District Court for the Southern District of Texas

based on an allegation of diversity jurisdiction.  *See* Dkt. No. 1 (Notice of Removal) at p. 2.

Vantage moved to remand the case to state court.  The District Court denied Vantage's motion to

remand, but ordered that Vantage could seek permission from the United States Court of Appeals

for the Fifth Circuit to review the existence of diversity jurisdiction.  The Fifth Circuit has

granted that permission, and Vantage's appeal is now pending [Case No. 13-20379].

### C. Su Is Attempting to Encumber the VTG Shares By Placing Them into "Escrow" with the Debtors' Counsel in the TMT Bankruptcy

Su initiated the TMT Bankruptcy on June 20, 2013 in an effort to salvage his ownership

of seventeen ships held by single-purpose, foreign entities over which Su himself exercises sole

control.[9]  The TMT Bankruptcy Debtors seek bankruptcy protection from approximately $1.9

billion in debts owed to creditors who are also located exclusively outside of the United States.

The TMT Bankruptcy involves only a subset of the ships under Su's control, however, leaving

numerous others exposed to potential seizure by unpaid creditors, and paints a picture of a

sprawling, deeply indebted network of shipping interests that are on the brink of financial

---

[9] *See* Ex. 2 (Excerpts of Transcript of July 16, 2013 TMT Bankruptcy Hearing before Judge Marvin Isgur) pp. 109:12-110:1; *Id.* pp. 181:3-9.

collapse.[10] Su has even testified in the TMT Bankruptcy that at least eight of the vessels involved in the matter are currently under "arrest" for unpaid debts at various ports around the world.[11]

Su presents, at best, only tenuous arguments that the TMT Bankruptcy was filed in good faith, and the Secured Creditors in the proceeding are pursuing an expedited Fifth Circuit appeal of their motions to dismiss the bankruptcy.[12] The Secured Creditors cite numerous indicia of bad faith, and argue that the Debtors improperly seek release of debts incurred by "loosely related, select entities of an entirely foreign shipping enterprise—with no meaningful U.S. connections but with substantial foreign assets; overwhelmingly (if not entirely) foreign creditors; and a foreign national as sole indirect or direct equity security owner[.]" Ex. 12 pp. 1-2.

Su has likewise presented the Bankruptcy Court with only an embryonic description of a concept for reorganizing the Debtors,[13] and the Bankruptcy Court has ordered Su to submit $40.75 million in property from outside of the Debtors' estate to serve as security for the TMT

---

[10] *See id.* pp. 45:24-46:9 ("[Counsel for Official Committee of Unsecured Creditors:] This entity, this family or group of entities—according to the testimony, which was imprecise, but we will use for purposes of this from Mr. Nobu Su, is that there is at least 60 entities and perhaps as many as 70 entities, that make up the TMT family. Of that, 27 of them have submitted to Your Honor jurisdiction. Of them, *there are at least 30 vessels*—we could not get a precise count in the depositions. But we believe the testimony was that there was approximately 30 vessels. *Seventeen vessels are included in this bankruptcy filing*.") (emphasis added).

[11] *Id.* pp. 181:3-9 ("**Q:** Before I show you a chart, are you aware some of your vessels are currently under arrest? **A:** [Nobu Su] Yes, sir. **Q:** Do you know approximately how many? **A:** Eight, sir. **Q:** Okay. So nine vessels are not under arrest. **A:** Yes, sir.").

[12] *See generally* Ex. 12 (Statement of Secured Creditors in Support of Appeal as of Right and Motion in the Alternative for Leave to Appeal, filed August 6, 2013 in the TMT Bankruptcy).

[13] Su's idea to reorganize the Debtors consists of a concept to convert two debtor ships into LNG tankers or processing equipment, at an approximate cost of $1.6 billion. *See* Ex. 13 (Excerpts of Transcript of July 17, 2013 in TMT Bankruptcy Hearing before Judge Marvin Isgur) pp. 118:5-120:5. Su has done virtually no work to advance this concept, however. Su candidly admits, for example, that none of his affiliated businesses participate in any facet of the LNG industry, Ex. 2 pp. 317:21-318:13, that he has identified no investors to fund the billion-dollar conversions, Ex. 13 pp. 119:15-120:5, and that it would take a shipyard up to three years to convert Su's ships for that purpose, *id.* pp. 109:23-110:1.

Bankruptcy to move forward.[14]   Su therefore caused F3 Capital to deliver certificates for approximately 17.75 million VTG Shares to the Debtors' counsel, and has offered up to 25 million VTG Shares to collateralize the Debtors' Chapter 11 restructuring efforts.[15]   The Bankruptcy Court has taken this proposal under advisement, but has expressed doubts about the propriety of a pledge of the VTG Shares, acknowledging that it would be necessary to "determine whether the estates will take shares subject to a constructive trust" in Vantage's favor, and further emphasized that "I'm not going to get stuck in a position where I say, 'Well that's a good offer,' and where a year later Judge Hughes says, 'I was here first[.]'"[16]

On July 29, 2013, Vantage filed a brief in the TMT Bankruptcy opposing the proposed escrow of the VTG Shares.[17]   In response, the Debtors have objected that Vantage has no standing to protect its rights in the TMT Bankruptcy. *See* Ex. 8.[18] and further contends that the Debtors are entitled to pledge the shares because "no injunctive relief has been sought by [Vantage] or imposed by the District Court." Ex. 10 (Proposed Share Escrow Agreement filed in TMT Bankruptcy August 6, 2013) ¶ 3.01(e).

---

[14] *See* Ex.9 (TMT Bankruptcy Order dated July 23, 2013).  A complete list of the permitted uses of these assets is set forth in Section III.C, *infra*.

[15] *See* Ex. 2 (Excerpts of Transcript of July 16, 2013 TMT Bankruptcy Hearing before Judge Marvin Isgur) pp. 281:3-14; 282:22-283:3; 289:19-290:12; *see also* Ex. 3 (Expedited Motion to Approve Share Escrow Agreement) p. 3 n.2; Ex. 4 (Letter from Evan D. Flaschen to Joshua P. Agrons dated July 24, 2013) (asserting that Su's surrogate F3 Capital "has already placed certain of its VTG shares in escrow as a commitment to the Chapter 11 process" and cautioning Vantage "to consider your letter in context of 11 U.S.C. § 362").

[16] See Ex. 2 (Excerpts of Transcript of July 16, 2013 TMT Bankruptcy Hearing before Judge Marvin Isgur) p. 292:18-21; Ex. 11 (Excerpts of Transcript of July 18, 2013 TMT Bankruptcy Hearing before Judge Marvin Isgur) p. 311:13-14.

[17] *See* Ex. 7 (Vantage Drilling Co.'s Brief in Opposition to Hsin-Chi-Su's Brief Regarding F3 Capital's Proposed Escrow of Vantage Shares and Motion to Abstain or, Alternatively, Request for Entry of Proposed Findings and Conclusions under 28 U.S.C. § 157(C), filed July 29, 2013 in the TMT Bankruptcy).

[18] *See* Ex. 8 (Debtors' Objection to Vantage Drilling Company, Inc.'s Motion to Abstain or, Alternatively, Request for Entry of Proposed Findings and Conclusions, filed in the TMT Bankruptcy on August 2, 2013).

For the reasons stated herein, Vantage respectfully requests that the Court preserve its jurisdiction in this matter by preliminarily enjoining Su from pledging the 25 million VTG Shares in the TMT Bankruptcy or taking any other action to encumber the VTG Shares, and that the Court grant Vantage's request for expedited discovery regarding the legal status of the VTG Shares obtained by Su as a result of his breaches of fiduciary duty and fraud towards Vantage.

### III.   ARGUMENTS & AUTHORITIES

#### A. The Court Has Jurisdiction to Enter Provisional Orders Preserving the Status Quo Pending Determination of the Existence of Subject Matter Jurisdiction

Although the final determination of this Court's subject matter jurisdiction lays with the Fifth Circuit, settled law recognizes the jurisdiction of federal courts both to determine their own jurisdiction, *see, e.g.*, *Cerveceria Cuauhtemoc Moctezuma S.A. de C.V. v. Mont. Beverage Co.*, 330 F.3d 284, 286 (5th Cir. 2003); *Omni Hotels Mgmt. Corp. v. Bayer*, 235 Fed. Appx. 208, 210 (5th Cir. 2007), *Habetz v. Louisiana High School Athletic Ass'n*, 915 F.2d 164, 167 (5th Cir. 1990), and also to enter preliminary injunctions or other provisional orders to preserve the status quo pending the resolution of that question, *see, e.g.*, *Stewart v. Dunn*, 363 F.2d 591, 598  (5th Cir. 1966) ("The law is clear that pending a decision on the question of jurisdiction, a District Court has the power to issue a temporary restraining order in order to preserve existing conditions."); *United States v. United Mine Workers of Am.*, 330 U.S. 258, 293, (1947); *RA Global Servs. v. Apps*, Civ. Act. No. 07-CV-1562-L, 2008 U.S. Dist. LEXIS 50164, *3-4 (N.D. Tex. July 1, 2008) ("Pending a determination of the jurisdiction issue, a court has the power to issue temporary restraining orders to maintain the status quo.").

Hence, although Vantage respectfully files this application without waiver of its motion to remand, this Court plainly has jurisdiction to enter the requested preliminary injunction to preserve the VTG Shares at issue until the jurisdictional issue can be decided.

### B. Su Should be Preliminarily Enjoined from Encumbering the VTG Shares

Su should be preliminarily enjoined from taking any action to sell, pledge, deposit into the registry of the Bankruptcy Court, or otherwise encumber the VTG shares. Su's actions are designed to obstruct Vantage's ability to impose a constructive trust over the VTG Shares as a remedy for Su's breaches of fiduciary and other duties, and therefore threaten to destroy the ability of whichever Court ultimately decides the merits to render effective relief.

The four requirements for obtaining a preliminary injunction are: "substantial likelihood of success on the merits, substantial threat of irreparable harm absent an injunction, a balance of hardships in [the movant's] favor, and no disservice to the public interest." *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 582 (5th Cir. 2013); *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009). In particular, it is well settled that a district court can issue a preliminary injunction to secure rights to equitable relief such as restitution or the imposition of a constructive trust. *See, e.g., Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 561 (5th Cir. 1987) ("In suing for a constructive trust, an accounting, and restitution of funds milked from Vernon in violation of fiduciary duties, FSLIC is pursuing equitable remedies. Thus, . . . an asset freeze by preliminary injunction is an appropriate method to assure the meaningful, final equitable relief sought.").

### 1. Vantage Has a Substantial Likelihood of Success on the Merits

Vantage has shown that it has a substantial likelihood of success on the merits. "To show a likelihood of success, the plaintiff must present a prima facie case, but need not prove that he is

entitled to summary judgment." *See Daniels Health Scis.*, 710 F.3d 579, 582 (5th Cir. 2013); *Janvey v. Alguire*, 647 F.3d 585, 595-96 (5th Cir. 2011) ("To satisfy the first element of likelihood of success on the merits, the Receiver's evidence in the preliminary injunction proceeding is not required to prove [his] entitlement to summary judgment." (quotation and citation omitted)); CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, 11A FEDERAL PRACTICE & PROCEDURE § 2948.3 (2d ed. 1995) ("All courts agree that plaintiff must present a prima facie case but need not show that he is certain to win." (footnote omitted)).

### a. Vantage has Shown Prima Facie Evidence of Fraud and Breach of Fiduciary Duty Against Su

"To assess the likelihood of success on the merits, the Court looks to standards provided by the substantive law." *Janvey*, 647 F.3d at 596 (citation omitted); *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990). Vantage's claims against Su include claims for breach of fiduciary duty, fraud, fraudulent inducement, and unjust enrichment. *See* Ex. 6 ¶¶ 60-67.

Because Vantage is an exempted company registered under the laws of the Cayman Islands, under the internal affairs doctrine the laws of that country govern Su's duties to Vantage. *See* TEX. BUS. ORG. CODE § 1.102. The substantive provisions of Cayman Island law are in accord with Texas, however, and hence the result is the same regardless whether the Court applies Texas or Cayman Islands Law. *Compare Hayat v. Al-Mazeedi*, No. 08-1004, 2011 WL 1532109, *3 (Mass. Sup. 2011) ("As in American law, the British and Cayman authorities unflinchingly characterize the relationship between a director and the corporation as fiduciary in nature.") *and In re. Bristol Fund Ltd.*, 2008 CILR 341 (citing *Armitage v. Nurse*, (1998) Ch. 241 (the duty to act honestly and in good faith is the "irreducible core" of a director's fiduciary duties) *with Int'l Bankers Life Ins.*, 368 S.W.2d 567, 576-77 (Tex. 1963) ("Nearly everywhere, and certainly in Texas, it is well established that officers of a corporation, by virtue of their

16

authority, privileges and trust, have a strict fiduciary obligation to their corporation . . . [which requires] '*an extreme measure of candor, unselfishness, and good faith.*" (emphasis added)).

"The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship existed between the plaintiff and defendant; (2) the defendant breached its fiduciary duty to the plaintiff; and (3) the defendant's breach resulted in injury to the plaintiff or benefit to the defendant." *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet denied); *Homoki v. Conversion Servs.*, 717 F.3d 388 (5th Cir. Tex. 2013). To recover for fraud, Vantage must prove: "(1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation, and (6) the party thereby suffered injury." *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001); *Lane v. Halliburton*, 529 F.3d 548, 564 (5th Cir. 2008). Fraudulent inducement "is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof. That is, with a fraudulent inducement claim, the elements of fraud must be established as they relate to an agreement between the parties." *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 277 (5th Cir. 2012) (citing *Haase v. Glasner*, 62 S.W.3d 795, 798-99 (Tex. 2001)).

As fully set out in the accompanying Affidavit of Christopher G. DeClaire, Vantage has presented far more than *prima facie* evidence of Su's wrongdoing, beginning with his fraudulent inducement of the Company's original September 2007 agreement to purchase Su's jackup rigs and an option on the *Platinum Explorer*, continuing through the parties' June 2008 transaction through which Su acquired his shares and a seat on the Vantage board, and extending through a

series of later fraudulent, self-interest transactions to which Vantage was forced to agree in order to stave off imminent financial crises caused by Su's misrepresentations. *See* Ex. 5, *passim*.[19]

Vantage's showing is especially strong under the circumstances of this case.  As shown, Su's misrepresentations induced Vantage to grant Su a seat on the Company's board, and thereafter Su failed to correct his prior falsehoods and instead leveraged the financial crises that he created to further line his own pockets.  *See generally* Section II.A, *supra*.   It is well established that "[w]hen self-dealing by the fiduciary is alleged as part of a breach of fiduciary duty claim, *a presumption of unfairness automatically arises* and the *burden is placed on the fiduciary* to prove that the questionable transaction was (1) made in good faith; (2) for fair consideration; and (3) after full and complete disclosure of all material information to the principal." *Houston v. Ludwick*, 2010 WL 4132215, at *7 (Tex. App.—Houston 2010); *see also General Dynamics v. Torres*, 915 S.W.2d 45, (Tex. App.—El Paso 1995) (in a self-interested transaction between a director and a corporation, "the fiduciary burden [is] imposed upon an officer of a corporation to prove the fairness of her or his profits and the inherent good faith of her or his actions.").

Su faces a steep burden to prove the fairness of these transactions given the evidence of his disloyal conduct.   Even if Su had fully disclosed all material facts related to these

---

[19] In his Motion to Dismiss this action pursuant to Federal Rule of Civil Procedure Rule 12(b)(6), Su argues that these claims are barred by limitations because his original fraud occurred in transactions entered into in September 2007 and March 2008.  It is well settled under the discovery rule, however, that a claim for fraud does not accrue when the "the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable." *Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex. 1996); *see also Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex. 1997). "An injury is inherently undiscoverable if it is by nature unlikely to be discovered within the prescribed limitations period despite due diligence." *S.V. v. R.V.*, 933 S.W.2d 1, 7 (Tex. 1996).

Despite Vantage's repeated requests for a copy of the DSME contract for the *Platinum Explorer*, Su refused to provide an unredacted copy of the agreement until August 29, 2008.  *See* Ex. 5 ¶ 8.  Hence the injury was inherently undiscoverable and limitations was tolled until that date.  Vantage filed this action on August 21, 2012, which is within the four-year statute of limitations for claims for fraud and breach of fiduciary duty. *See* Tex. Civ. Prac. & Rem. Code §§ 16.004(a)(4)-(5) (imposing four year limitations period for fraud and breach of fiduciary duty).  Su's limitations argument is therefore unavailing.

transactions, "ratification is not available to condone a corporate officer or director's disloyalty or fraud." *Torres*, 915 S.W.2d at 50; *see also Tyco Int'l Ltd. v. Walsh*, 2012 WL 75365 *2 (2d Cir. 2012) (citing UK and Bermudan law and concluding that "breach of duty which is dishonest and involves misappropriation of property from a company cannot be ratified."). Moreover, the record in this case will show that Su repeatedly kept the independent Vantage board members in the dark about: (1) his true intention or ability to actually perform his contracts with Vantage; (2) the true terms of his contracts with the DSME shipyard; and (3) his long-term plans to abrogate his contracts as part of a scheme to force Vantage to continually renegotiate its transactions on terms that were far more favorable to Su.

As such, Vantage has met its burden to demonstrate a prima facie case showing Su's fraud and breaches of fiduciary duty.

### b. Vantage is Entitled to the Imposition of a Constructive Trust over Su's VTG Shares to Avoid Unjustly Enriching Su through his Fraud and Self Dealing

In order to prevent Su from being unjustly enriched through his breaches of fiduciary duty and fraud towards Vantage, Vantage is entitled to the imposition of a constructive trust over the VTG Shares and other benefits that Su received through this conduct. *See Cote v. Texcan Ventures II*, 271 S.W.3d 450, 453 (Tex. App.—Dallas 2008, no pet.); *Baker Botts, L.L.P. v. Cailloux*, 224 S.W.3d 723, 736 (Tex. App.—San Antonio 2007, pet. denied). "'A constructive trust is a relationship with respect to property, subjecting the person by whom the title to the property is held to an equitable duty to convey it to another, on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property.'" *Cailloux*, 224 S.W.3d at 736 (quoting *Talley v. Howsley*, 142 Tex. 81, 176 S.W.2d 158, 160 (1943)). The elements of establishing entitlement to a constructive trust

are: (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res." *Cote*, 271 S.W.3d 450, 453 (Tex. App.—Dallas 2008, no pet.).

Vantage's reliance on Su's fraudulent misrepresentations caused Vantage great injury—and at times threatened its very existence. When Su made those misrepresentations, or failed to correct them, he sat on Vantage's board of directors, and therefore plainly breached his fiduciary duties to Vantage. Ex. 5, *passim.* At the same time, this scheme vastly and unjustly enriched Su, yielding over 100 million VTG Shares and a $60 million note from Vantage, among other benefits that are directly traceable to his tortious conduct. *Id.* ¶¶ 7, 10, 12, 16.

Under these circumstances, equity will not permit Su to retain the benefits that he obtained from his injured beneficiary. *See, e.g., Newby v. Enron*, 188 F. Supp.2d 684, 705-707 (S.D. Tex. 2002) (surveying English law on restitutionary remedies for breach of fiduciary duty and noting that fiduciaries "are accountable for profits without regard to whether or not the profit is at the expense of the principal"); *accord Burrow v. Arce*, 997 S.W.2d 229, 283 (Tex. 1999); *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565 (Tex. 1942) ("It is the law that in such instances if the fiduciary 'takes any gift, gratuity, or benefit in violation of his duty, or acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received.").

### 2. Vantage Faces Imminent, Irreparable Injury For Which There is No Adequate Remedy at Law Should the VTG Shares Be Encumbered

Su's plan to use the VTG Shares as collateral in the TMT Bankruptcy threatens imminent, irreparable injury for which Vantage has no adequate remedy at law. "In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d at 600. Here, Su has tendered the VTG Shares for use as collateral

with the transparent intention of obstructing Vantage from advancing its claim for constructive trust and, indeed, ***his counsel has already taken the position that they are being held in escrow for the benefit of the Debtors' estates*** and may even be subject to the automatic stay in bankruptcy.[20]

Although Vantage strongly believes such a pledge would be subject to being set aside based on the Company's superior equitable and legal rights to the shares, at a minimum the pledge would subject Vantage to unnecessary risk, disruption and expense. Furthermore, if and when the Court in the TMT Bankruptcy actually orders the sale of the VTG Shares to obtain the cash necessary to accomplish any of the currently listed reasons for disposition, the shares would presumably be purchased by hundreds (if not thousands) of retail and institutional investors, thus foreclosing the possibility of recovering the shares directly from Debtors' counsel or the court's registry in the TMT Bankruptcy.

It is well established that attempts to dissipate assets that are the subject of equitable claims for a constructive trust, replevin, or similar relief will support the imposition of injunctive relief to preserve the status quo. *See, e.g., Productos Carnic, S.A. v. Central American Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980); *Amegy Bank N.A. v. Monarch Flight II, LLC*, Civ. Act. No. H-11-3218, 2011 U.S. Dist. LEXIS 140874 (S.D. Tex., Dec. 7, 2011). In *Productos Carnic*, for example, the plaintiff filed suit to recover approximately 862,000 pounds of frozen food that it alleged had been unlawfully shipped from Nicaragua to the United States, and sought an injunction barring the plaintiff from transferring the food or any proceeds derived from it. *See* 621 F.2d at 685. The Fifth Circuit affirmed a preliminary injunction enjoining any

---

[20] *See* Ex. 4 (asserting that Su's surrogate F3 Capital "has already placed certain of its VTG shares in escrow as a commitment to the Chapter 11 process" and cautioning Vantage "to consider your letter in context of 11 U.S.C. § 362").

further shipment of these assets based on a the district court's finding that the defendant "intends to transfer the subject beef and/or its proceeds out of the jurisdiction of this Court, with the result that any judgment ultimately obtained against CABS Trading would be unenforceable. . ." *Id.* at 686. Similarly, in *Monarch Flight II*, as in this case, the plaintiff bank sought to recover the proceeds of partnership shares that had been pledged to secure a loan, but that were sold in breach of the defendants' obligations to the bank. *See* 2011 U.S. Dist. LEXIS 140874 *12, 18-19. After tracing the proceeds of those assets to certain real property held by the defendant, and recognizing that the property constituted the sole available asset to satisfy the plaintiff's claim if it succeeded on the merits of its claims, the court enjoined the defendant from taking any action to transfer, sell or encumber the property. *Id.* *18-19.

For similar reasons, the Court should enjoin any effort by Su to sell, transfer or otherwise encumber any of the VTG Shares over which Vantage seeks to impose a constructive trust in this action. The VTG Shares represent the most valuable benefit that Su wrongfully obtained from Vantage as a result of his breaches of duty, and Su has plainly shown that he intends to transfer or encumber those shares in hopes of shielding them from the reach of this Court's equitable powers to impose a constructive trust over them for Vantage's benefit.

### 3. The Balance of Hardships and Effect on Public Interests Weigh Strongly in Favor of a Preliminary Injunction

Moreover, as the TMT Bankruptcy Court has recognized, there are numerous legal, equitable and practical reasons why Su's proposal would impose severe, and unjustifiable hardships on Vantage and its other shareholders. The 25 million VTG Shares that Su has or will soon tender to the Bankruptcy Court represent approximately 10% of the Company's total outstanding stock, and are many multiples of Vantage's average daily trading volume of

approximately 1.3 million shares.[21]   Any future effort to expeditiously monetize the shares would likely overwhelm the ability of the market to absorb them, causing sharp reductions in share price to the detriment of Vantage's shareholders as well as those bankruptcy court parties looking ostensibly to the VTG Shares as collateral and/or a source of funding.

This result would be especially inequitable in the event Vantage's shareholders are forced to endure the losses caused by the Court's liquidation of the Vantage Shares if the VTG Shares are ultimately recovered by Vantage.   In those circumstances, the loss to shareholders—who have already been the victim of Su's repeated acts of fraud and breaches of fiduciary duty—would have been for nothing.   Accordingly, the balance of hardships and considerations of public interest strongly weigh in favor of granting the requested preliminary injunction.

### C. If the Shares are Permitted to be Used as Collateral in the TMT Bankruptcy, Su Should be Required to Obtain this Court's Consent before Taking Any Further Action to Sell or Encumber Them

For all of the reasons set forth herein, equity should not permit Su to take any actions whatsoever to encumber the VTG Shares in derogation of this Court's jurisdiction over those shares.   Should the Court permit Su the limited step of depositing those shares into escrow as collateral in the TMT Bankruptcy, Vantage respectfully requests that the Court retain jurisdiction over this motion and require Su to obtain the Court's consent prior to taking any subsequent steps to monetize, alienate or encumber the shares.   Su's motion to the TMT Bankruptcy court seeks permission to use the shares for a variety of purposes in connection with the those proceedings, including to:

(1) Ensure compliance with the TMT Bankruptcy court's orders;

---

[21] *See* Ex. 11 (Excerpts of Transcript of July 18, 2013 Hearing before Judge Marvin Isgur) pp. 225:4-8, 226:10-15.

(2) Provide a fund for payment of any sanctions ordered by the Court against one or more of the TMT Bankruptcy Debtors or their principals (i.e., Su himself), including any daily coercive sanctions ordered by the TMT Bankruptcy Court;

(3) Serve as collateral for a working capital loan to one or more Debtors if ordered by the Court;

(4) Satisfy any amounts arising under § 507(b) of the Bankruptcy Code, including without limitation any failure of adequate protection from the use of cash collateral;

(5) Collateralize an advance of any amounts due under the TMT Bankruptcy Court's Good Faith Order of July 23, 2013, and

(6) Serve any other purpose as may be from time to time be ordered by the TMT Bankruptcy Court.[22]

As these requested uses illustrate, the only way for the Court to fully protect its jurisdiction over the VTG Shares is to enter an order that prevents Su from encumbering the shares in any way.  As a practical matter, for example, it may be impossible to restrain Su or his debtor entities from incurring sanctions from the Bankruptcy Court.   However, even if the Court were to permit the threshold step of depositing the shares into escrow, Su should be required to obtain this Court's permission before taking any affirmative steps to monetize the VTG Shares through a sale or pledge of the shares for any of the above uses.

### D. Vantage Should Be Permitted to Conduct Limited Expedited Discovery to Determine whether the Remaining VTG Shares Have Been Encumbered, Transferred or Sold

In addition to its request for a preliminary injunction, Vantage respectfully renews its previous February 26, 2013 motion for leave to conduct an expedited deposition of Su regarding the current legal status of the VTG Stock, including an inquiry into the existence of any encumbrances of the VTG Shares.[23]   Vantage's motion outlined its well-founded concerns that

---

[22] See Ex. 3 ¶¶ 7(i)-(vi); Ex. 9 (TMT Bankruptcy Court Order dated July 23, 2013) ¶¶ E(i)-(vi).
[23] Plaintiff's Motion for Leave to Conduct Expedited Discovery is attached as Exhibit 1 and incorporated hereto as if set forth in full.

Su had become embroiled in a multitude of legal and financial disputes around the globe which created a grave risk that he would attempt to liquidate or otherwise encumber the VTG Shares that he equitably holds for Vantage. *See* Ex. 1 at pp. 6-8 (listing public reports of Su's various legal troubles which threatened to encumber the VTG Shares). Confirming these fears, on July 16, 2013, ***Su admitted in sworn testimony in the TMT Bankruptcy that 40 million of the VTG Shares are already subject to a security interest in favor of third parties.***[24]

Moreover, the Court will recall that Su has previously ignored court orders in other jurisdictions obliging him to make asset disclosures, which led one UK court to find Su in contempt and impose an 18-month prison sentence on Su. *See* Ex. 1 at Ex. 6, ¶ 7. Although the litigation leading to that contempt order has now been resolved, and the prison sentence removed, the June 2013 TMT Bankruptcy fully validates long-held concerns giving rise to Vantage's previous request for expedited discovery. In light of the clear signs that Su's affiliates are in a state of financial collapse, Vantage renews its request that the Court grant Vantage's motion to conduct an expedited deposition of Su within 30 days of the date of the date of this motion regarding the legal status of the VTG Shares, including the existence of any existing encumbrances on, or plans to encumber, the VTG Shares.

## IV.    CONCLUSION

For all of the reasons set forth herein, Vantage respectfully requests that the Court grant its application for a preliminary injunction, and further that it grant Vantage's request for an expedited deposition of Su to discover the legal status of the VTG Shares and the existence of any existing encumbrances on, or plans to encumber, the VTG Shares.

---

[24] *See* Ex. 2 p. 272:20-24.

Respectfully Submitted,

OF COUNSEL:          OF COUNSEL:

By: _/s/ Richard W. Mithoff_      By: _/s/ Vidal G. Martinez_      By: _/s/ Robin C. Gibbs_
Richard W. Mithoff          Vidal G. Martinez          Robin C. Gibbs
State Bar No. 14228500     State Bar No. 13144650     State Bar No. 07853000
So. District No. 2102       So. District No. 4190       So. District No. 4790
Sherie P. Beckman         **MARTINEZ PARTNERS LLP**   **GIBBS & BRUNS, LLP**
State Bar No. 16182400     One Riverway         1100 Louisiana
So. District No. 11098      Suite 1700           Suite 5300
Warner V. Hocker        Houston, Texas 77056    Houston, Texas 77002
State Bar No. 24074422     Telephone: 713-300-3850  Telephone: 713-650-8805
So. District No. 1133732    Facsimile: 713-513-5546   Facsimile: 713-750-0903
**MITHOFF LAW FIRM**
500 Dallas Street
One Allen Center
Suite 3450                                    **ATTORNEY-IN-**
Houston, TX 77002                       **CHARGE FOR**
Telephone: 713-654-1122                   **PLAINTIFF**
Facsimile: 713-739-8085

OF COUNSEL:

Julian J. Fertitta, III                             OF COUNSEL:
State Bar No. 00795060
So. District No. 21954                         David Sheeren
GRIMES & FERTITTA, P.C.              State Bar No. 24079313
440 Louisiana                            So. District No. 1339705
Suite 1818                             **GIBBS & BRUNS, LLP**
Houston, Texas 77002                1100 Louisiana
Telephone: 713-224-7644            Suite 5300
Facsimile: 713-224-0733            Houston, Texas 77002
                                     Telephone: 713-650-8805
                                     Facsimile: 713-750-0903

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on all counsel via Electronic filing and/or U.S. mail, pursuant to the Federal Rules of Civil Procedure and the Southern District's Local Rules, on this the 14th day of August, 2013:

***Via U.S. Mail and Email***
Bradley J. Benoit
brad.benoit@bgllp.com
Ralph D. McBride
ralph.mcbride@bgllp.com
Phillip L. Sampson, Jr.
phillip.sampson@bgllp.com
BRACEWELL & GIULIANI LLP
711 Louisiana St., Suite 2300
Houston, Texas 77002-2770


  */s/ David Sheeren*
David Sheeren